# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

(No. 11469.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* LEWIS G. STEVENSON, Secretary of State, *et al.* Appellants.

*Opinion filed October 23, 1917—Rehearing denied Dec. 7, 1917.*

1. CONSTITUTIONAL LAW—*by section 2 of article 14 of constitution a majority of electors voting is required to adopt constitutional amendment.* Under section 2 of article 14 of the constitution, providing that amendments to the constitution shall be voted upon at an election when members of the General Assembly are to be elected, a majority of the electors voting at said election, and not merely a majority of those voting for members of the General Assembly, is required to adopt the amendment.

2. SAME—*constitutions are construed according to the natural meaning of the language used.* Constitutions, as well as statutes, should be read and understood according to the most natural and obvious import of the language used, without resort to subtle and forced construction to limit or extend their operation.

3. SAME—*when contemporaneous construction will be considered.* In the absence of judicial construction of an ambiguous or doubtful provision of the constitution, contemporaneous and long continued construction by the legislative and executive departments will be considered by the courts; but the courts will not be bound by such construction, no matter how long continued, when it is contrary to unambiguous language.

4. SAME—*section 2 of article 14 of the constitution is not self-executing.* Section 2 of article 14 of the constitution is not self-

281 – 2

executing but provides for the submission of constitutional amendments to the electors for adoption or rejection "in such manner as may be prescribed by law."

5. SAME—*act of 1877, providing for proposing and submitting of amendments to constitution, construed.* *The act of 1877, providing for the proposing of amendments to the constitution and the submitting of them to the electors, conforms to section 2 of article 14 of the constitution in requiring a majority of the electors voting at the election at which the amendment is submitted to adopt an amendment, and does not recognize as the test a majority of those voting for members of the General Assembly.

CARTER, C. J., and CARTWRIGHT, J., dissenting.

APPEAL from the Circuit Court of Sangamon county; the Hon. NORMAN L. JONES, Judge, presiding.

EDWARD J. BRUNDAGE, Attorney General, WILSON, MOORE & McILVAINE, GEORGE C. GALE, and BROWN, HAY & CREIGHTON, (N. G. MOORE, of counsel,) for appellants.

C. R. MORTIMER, State's Attorney, W. ST. J. WINES, FIFER & BOHRER, and BARRY & MORRISSEY, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

The legislature of Illinois at its 1915 session adopted a resolution submitting to the people of the State the question of the adoption of a proposed amendment to the constitution, to be known as section 14 of article 9. The proposed amendment was as follows:

"From and after the date when this section shall be in force the powers of the General Assembly over the subject matter of the taxation of personal property shall be as complete and unrestricted as they would be if sections one (1), three (3), nine (9) and ten (10) of this article of the constitution did not exist: *Provided, however,* that any tax levied upon personal property must be uniform as to persons and property of the same class within the jurisdiction of the body imposing the same, and all exemptions from taxation shall be by general law, and shall be revocable by the General Assembly at any time."

No question is raised as to the procedure in submitting the proposed amendment to the people to be voted upon. This was done at the general election of November 7, 1916, at which time a Governor, Lieutenant-Governor, Secretary of State, Auditor, Treasurer, Attorney General, Superintendent of Public Instruction, presidential electors, members of Congress and members of the General Assembly were voted upon. The ballots were cast, canvassed and returns made according to law. Subsequently, within the time prescribed, the then Secretary of State, Auditor of Public Accounts and State Treasurer, in the presence of the Governor, in their capacity as the State canvassing board, canvassed the returns, including the votes for and against the proposed amendment. The board of canvassers on December 9, 1916, in the presence of the Governor, made a written declaration of the result of the vote as to the adoption of said proposed amendment, which was signed by the said three State officers and certified to by the Governor. Said certificate, so far as here involved, is as follows:

"We, the undersigned State officers of the State of Illinois, do hereby certify that we have on the 24th day of November, A. D. 1916, and between that date and this 9th day of December, A. D. 1916, in the presence of the Governor, carefully canvassed the votes given at the above named election for and against the adoption of the proposed amendment to the constitution of the State of Illinois recited above, and find that the highest legislative vote cast at said election was 1,269,331; that the total number cast for the adoption of said amendment was 656,298; that the total number of votes cast against said amendment was 295,782; that a majority of all the votes cast at said election for members of the General Assembly was cast in favor of the adoption of said amendment to the constitution, and we hereby declare, in conformity to the law, that

the amendment aforesaid is adopted and henceforth becomes a part of the constitution of the State of Illinois."

Due proclamation was made by the Governor that the amendment had been adopted and had become a part of the constitution, which was published as required by law. The total vote cast for the adoption of the proposed amendment exceeded one-half of the highest vote for members of the General Assembly. It did not equal one-half of the number on the poll-list, nor the vote for presidential electors, nor that for Governor, but exceeded one-half the vote cast for any other State officer and for members of the General Assembly.

At the January term of the circuit court of Sangamon county the State's attorney of that county, on behalf of the People of the State of Illinois, filed a petition for *certiorari,* making the officers comprising the State canvassing board parties defendant. The writ was ordered issued and a return to the same made by defendants January 6, 1917, to which was attached a sheet on which the vote was shown and the result compiled, and containing the certificate of the canvassing board which we have before set out. The terms of office of said parties defendant having expired, their successors were substituted as defendants. The return to the writ showed 1,343,381 male electors voted at said election; that 656,298 voted for the proposed amendment and 295,782 against it. The highest vote for members of the General Assembly (hereafter designated highest legislative vote) was 1,269,331. This highest legislative vote was arrived at by taking the aggregate vote in each county for members of the house of representatives and dividing it by three. The aggregate vote for State senator in each county where candidates for State senator were voted for was ascertained, and if the vote for senator exceeded one-third the number of votes for members of the house of representatives in such county the vote for senator was taken; if it did not exceed one-third the number

of votes for members of the house of representatives the latter was taken as the highest legislative vote for that county. An aggregate of the highest legislative vote in all the counties thus obtained was found to be as above stated, 1,269,331. It appearing that the total number of votes cast for the adoption of the amendment was a majority of the legislative vote thus arrived at, said amendment was declared adopted. The trial court reviewed the action of the canvassing board and its finding that the proposed amendment was adopted, found for petitioner and quashed the record and return of such board. The judgment of the circuit court, entered April 16, 1917, recites defendants to the writ had jurisdiction to canvass the vote and determine and announce the result, but "that the method pursued by said board of canvassers for determining whether said amendment to the constitution had been duly adopted was not in pursuance of their jurisdiction and that their conclusion thereon was not reached in the due and proper exercise of their jurisdiction." The court quashed, annulled and set aside the proceedings set forth in defendants' return to the writ of *certiorari* as being without authority of law. From that judgment this appeal is taken.

The question to be determined is whether, under article 14 of the constitution of 1870, the test or criterion for the adoption of a constitutional amendment is a majority of the total number of electors voting at the election or a majority of the electors voting for members of the General Assembly.

The constitution of 1818 (article 7) contained no provision for submitting to the people the question of the adoption of an amendment. Under that constitution, when two-thirds of the General Assembly thought it necessary to alter or amend that instrument they could recommend "to the electors, at the next election of members to the General Assembly, to vote for or against a convention," and if "a majority of all the citizens of the State, vot-

ing for representatives," voted for a convention, the General Assembly was required, at its next session, to call a convention. Section 1 of article 12 of the constitution of 1848 provided that when two-thirds of all the members elected to each branch of the General Assembly thought it necessary to amend or alter that instrument, they should recommend to the electors, "at the next election of members of the General Assembly," to vote on the question, and if "a majority of all the electors of the State voting for representatives" voted for a convention one should be called. Section 2 authorized the submission by the General Assembly of amendments to the constitution. When the General Assembly, by a two-thirds vote of the members elect in each house, proposed an amendment it was referred to the next regular session of that body, and if it received the vote of a majority of all the members elect in each branch it was required to be submitted to the people "at the next general election," and if a majority "of all the electors voting at such election for members of the house of representatives" voted for the amendment it became a part of the constitution.

It will be seen that the proposition for calling a convention under the constitutions of 1818 and 1848 was required to be submitted to the electors at the next election of members of the General Assembly, and if a majority "voting for representatives" voted for the convention one should be called. As to amendments to the constitution of 1848, after they had received the approval of two General Assemblies they were required to be submitted for adoption or rejection at the next general election in such manner as might be prescribed by law, "and if a majority of all the electors voting at such election for members of the house of representatives" voted for an amendment it became a part of the constitution. In language too plain to admit of dispute, both constitutions made the vote for members of the house of representatives the test for determining

whether a constitutional convention should be called or whether an amendment had been adopted at an election where that question was submitted to be voted upon.

Under section 1 of article 14 of the constitution of 1870 the question of calling a convention to alter or amend that instrument is required to be submitted "to the electors at the next general election," and "if a majority voting at the election" vote for a convention the General Assembly is required to provide for the convention. The vote for members of the house of representatives as the test for determining whether the proposition for calling a convention had carried was no longer to govern but instead "a majority voting at the election" was made the test. Section 2 of said article 14 provides for the submission of constitutional amendments and is the provision here under consideration. It requires amendments to be submitted "to the electors of this State * * * at the next election of members of the General Assembly, in such manner as may be prescribed by law, * * * and if a majority of the electors voting at said election shall vote for the proposed amendments" they shall become a part of the constitution. The election designated as the time when amendments shall be submitted to the electors for adoption or rejection is the next election of members of the General Assembly, which is the same election designated by the constitutions of 1818 and 1848 for submission of a proposition for calling a constitutional convention, but instead of making a majority of the electors voting for representatives the test for determining whether a convention should be called or whether an amendment had been adopted, as was the requirement of the constitutions of 1818 and 1848, the constitution of 1870 makes the test "a majority of the electors voting at said election." The language seems plain and unambiguous that amendments shall be submitted to be voted upon at an election when members of the General Assembly are to be elected, and a majority of the electors voting at said election,—not a ma-

jority voting for members of the General Assembly at said election,—is required to adopt the amendments. To give the language used that meaning does not require resort to interpolating in the section language not found there, for the purpose of giving effect to a supposed intention not expressed in the constitution. The members of the constitutional convention knew that at the election for members of the General Assembly various other officers were voted upon, and could not have intended, by making a majority "of the electors voting at said election" necessary to adopt an amendment, that a majority of those voting for members of the General Assembly was meant to be the test. To give the language used that construction would be to disregard the ordinary meaning it conveys to the mind of one reading it and substitute an intention supposed to have been in the minds of the members of the constitutional convention but which they failed to express in the language used.

Counsel for appellants refer to the debates in the constitutional convention when section 2 was being considered as being of some help in determining the intent and meaning of the language used. The majority of the committee on future amendments reported sections 1 and 2 of article 14 to the committee of the whole in substantially the same language they appear in the constitution. There were two minority reports and there was a lengthy debate, but the question here involved was not raised or referred to. The questions of difference discussed related principally to the difference in the majority and minority reports of proposed section 1 as to the requirements of the oath to be taken by members of a constitutional convention, if one should be called, the number of members and their pay. There was some debate on the last clause of section 2, that no amendment to more than one article of the constitution should be submitted at the same session nor to the same article oftener than once in four years. Section 2 as re-

ported in both minority reports provided for the submission of an amendment "at the next general election," and required a majority of all the electors voting at the election to adopt it. We have been unable to find the difference in this respect in the language of section 2 as reported by the majority and the minority was referred to in the debates. For aught that appears from the discussions, the members of the convention understood that in this respect both proposed sections made the same vote the test or criterion in the adoption of constitutional amendments. We find nothing in the debates which lends support to the construction appellants contend for.

"The constitution does not derive its force from the convention which framed but from the people who ratified it, and the intent to be arrived at is that of the people." (*City of Beardstown* v. *City of Virginia*, 76 Ill. 34.) It seems to us that the people who read and voted on the adoption of the constitution would not have understood it to mean that an election at which a constitutional amendment was voted on, whether it was adopted or rejected, was to be determined by the vote of those, only, who voted for members of the General Assembly. A more reasonable understanding, requiring no construction or conjecture, would seem to be that the amendment must receive a majority of the votes cast at the election. Constitutions, as well as statutes, should be read and understood according to the most natural and obvious import of the language used, without resort to subtle and forced construction for the purpose of limiting or extending their operation. (*City of Beardstown* v. *City of Virginia, supra.*) It is conceded decisions of other States construing their constitutions are of little value, as the courts of each State construe their own constitutions. Both parties cite the same decisions of the Supreme Courts of Ohio and Nebraska and also cite some decisions of courts of other States, but we do not consider any of them directly in point even if we felt at liberty to

follow decisions in other States in construing our own constitution. The intention to which force is given in construing constitutional provisions is that which is embodied and expressed in the language of the provisions. As a constitution is dependent upon adoption by the people, the language used will be understood in the sense most obvious to the common understanding. The language and words of a constitution, unless they be technical words and phrases, will be given effect according to their usual and ordinary signification, and courts will not disregard the plain and ordinary meaning of the words used, to search for some other conjectural intention. 6 R. C. L. 52; *Law* v. *People,* 87 Ill. 385; *Hills* v. *City of Chicago,* 60 id. 86.

The record contains a table of the votes cast for senator in each county forming a district or part of a district in which a senator was elected; also the aggregate vote for representatives, which aggregate is divided by three to ascertain the number of electors voting for representatives. The table shows that with few exceptions there were more electors voted for senator than voted for representatives. In some counties the vote for senator exceeded that for representatives nearly one-half. It is obvious that the vote for members of the General Assembly is not a reliable test for determining the number of electors voting at the election.

It is not disputed that the number of electors voting at an election means the number of votes cast, and if we were to indulge in conjecture as to the reason for changing the test from a majority of those voting for representatives to a majority of those voting at said election, it might be found in the fact that the number of those voting at the election could be more easily and nearly accurately determined by taking the highest vote cast at the election as the test than by taking the number of those voting for members of the General Assembly. Under the previous constitutions there was no cumulative system of voting for members of the house of representatives, but as the number to

be elected varied in different districts or territory, according to population, it can readily be seen that there might easily be a wide discrepancy between the number of votes cast at the election and the number of votes cast for representatives. So, too, under the provision for minority representation, (which was, it is true, submitted as an alternative but nevertheless submitted for adoption or rejection,) which authorizes cumulative voting for representatives, it is obvious the total number of votes cast at the election could not be arrived at with accuracy by making the vote for members of the General Assembly the test.

In the absence of judicial construction, contemporaneous and long continued construction by the legislative and executive departments has always been treated by the courts as worthy of consideration where there is ambiguity or doubt. (*Stuart* v. *Laird,* 1 Cranch, 299; *Nye* v. *Foreman,* 215 Ill. 285.) Section 2 of article 14 is not self-executing, and provides for the submission of constitutional amendments for adoption or rejection to the electors "in such manner as may be prescribed by law." In 1877 the legislature enacted chapter *7a,* entitled "An act to provide the manner of proposing amendments to the constitution, and submitting the same to the electors of this State." (Hurd's Stat. 1916, p. 55.) The act contains eight sections. The first section provides that a constitutional amendment proposed by a two-thirds vote of all the members of the General Assembly elected to both houses, in the manner provided by section 2 of article 14 of the constitution, "shall be submitted to the electors of this State for adoption or rejection in the manner hereinafter provided." Section 2 provides for the publication of the amendment by the Secretary of State three months before the election of members of the General Assembly, with notice that the amendment will be submitted "to the electors of this State for adoption or rejection." Section 3 provides for notice to be given by the county clerks that at the election the proposed amend-

ment "will be submitted to the electors of this State for adoption or rejection." Section 4 relates to the form of the ballot. Section 5 provides for the canvass and return of the ballots. Section 6 requires county clerks, when they make abstracts of "the votes cast at such elections for officers," to also make abstracts of "the votes cast for and against" the proposed amendment, and send them by mail to the Secretary of State. Section 7 requires the Secretary of State, Auditor, Treasurer and Attorney General, or any two of them, in the presence of the Governer, to canvass the votes for and against said amendment or amendments, and if it appears that a "majority of the electors voting at said election" have voted for the proposed amendment said board of canvassers shall declare it adopted, but if it appears that "a majority of the votes polled" are against the proposed amendment it shall be null and void. Section 8 provides that "whenever any amendments to the constitution shall have been proposed to and adopted by the electors of this State in the manner provided by this act" the same shall be enrolled and numbered in the order of time in which they were adopted and be preserved by the Secretary of State. Throughout that act the test recognized is not a majority of the electors voting for members of the General Assembly but is a majority of the electors voting at said election. Nowhere in the act is the vote for members of the General Assembly mentioned as a basis or test for determining whether an amendment is adopted, but the question of its adoption or rejection is required to be submitted to the electors of this State. Section 6 requires abstracts of the votes for officers as well as for and against the amendment to be made and transmitted to the Secretary of State, and section 7 expressly says "if it appears that a majority of the electors voting at said election" have voted for the amendment it is adopted. There is nothing in the act to afford any basis for construing it to indicate the legislature understood the constitution to make the legislative vote the

test. As we understand the act from the language used to express the intention of the legislative body, it was the purpose to require "a majority of the electors voting at said election" to adopt a constitutional amendment. That is what the act says, and we must suppose the General Assembly understood that to be the requirement of the constitution.

Again, there have been seven amendments adopted to the present constitution, the first in 1878 and the last in 1908. In determining the result of the vote on each proposed amendment the canvassing board and the Governor took the highest vote cast at the elections without reference or regard to the vote for members of the General Assembly. In the vote on the first proposed amendment the canvassing board took the vote for the office of clerk of the Supreme Court, that being the highest vote cast at the 1878 election. It is true, as appellants say, that the question of what particular vote was required to be taken to determine whether an amendment was adopted apparently was not raised, and the result would not have been different whether the highest vote cast at the election or the vote cast for members of the General Assembly was adopted as the test, still in each of the seven instances whether the amendment received a majority of the highest vote cast for any officer at the election was made the test. We must assume that, although there was no controversy raised about it, the executive department of the government interpreted the constitution to require the affirmative vote of a majority of the electors voting at the election to adopt an amendment. Courts are not bound by contemporaneous, practical, legislative and executive construction, no matter how long continued, when there is no ambiguity and such construction is contrary to the unambiguous language of the constitution, but the construction given section 2 of article 14 by the legislative and executive departments, we think, is not contrary to the intent and meaning of the language of said section. If we

were to consider the language of said section ambiguous and its meaning doubtful we would be inclined to adopt the construction of the other departments of the State government, for in such cases their construction has almost the force of judicial exposition. *People* v. *Loewenthal,* 93 Ill. 191; *Nye* v. *Foreman, supra.*

Appellants call our attention to the proposed $60,000,-000 bond issue for good roads soon to be submitted to the electors in this State for adoption or rejection. This question is to be submitted under and by authority of section 18 of article 4 of the constitution, which reads: "And no other debt * * * shall be contracted, unless the law authorizing the same shall, at a general election, have been submitted to the people, and have received a majority of the votes cast for members of the General Assembly at such election." This section expressly makes a majority of the votes cast for members of the General Assembly the test of adoption and is entirely different from the language of section 2 of article 14 which we are here called upon to construe. There can be no doubt the vote for members of the General Assembly could have been made the test or criterion by section 2, but to our minds the language used does not import that it was so intended. We have seen (section 18 of article 4) that where the framers of our constitution intended to make the vote for members of the General Assembly the test they knew how to express that intention in language so clear and explicit that it could not be misunderstood.

We conclude that section 2 of article 14 requires for the adoption of a proposed amendment to the constitution a majority of the votes of all the electors voting at an election at which members of the General Assembly are elected, and not, as contended by appellants, a majority of the votes cast for members of the General Assembly. The latter construction would be reading into the section something that is not there in express words, nor, do we think, by implica-

tion.  The change in verbiage or phraseology of section 2
of article 12 of the constitution of 1848 and section 2 of
article 14 of the present constitution is presumed to have
been intentional, made advisably and for a purpose. .

For the reasons stated, the judgment of the circuit court
quashing the record of the board of canvassers and setting
aside the proceedings of said board, and finding that said
board's conclusion "was not reached in the due and proper
exercise of their jurisdiction," is affirmed.

*Judgment affirmed.*

Mr. CHIEF JUSTICE CARTER, dissenting:

I cannot concur in the reasoning or the conclusion
reached in the foregoing opinion.  The construction put
upon the section of the constitution in question is to me
not the natural one and not the one intended to be placed
upon it by the members of the constitutional convention and
the people who ratified its work.  Beyond question the con-
vention could have made the test for the adoption of an
amendment that the majority opinion holds was made, but
it seems to me the conclusion reached by the opinion on this
point is most unreasonable in view of the wording of other
sections of the constitution as to determining the results of
the election, and especially in view of the wording of the
first section of article 14, on amendments, which provides,
in terms, that if a convention is to be called to amend a
constitution "the question shall be submitted to the electors
at the next general election."  The convention clearly had
in mind different standards for determining the result of
elections, for it provided in section 4 of article 5 of the con-
stitution that the candidate for Governor should be elected
by receiving the highest number of votes cast for that office.
A similar provision was found in sections 7 and 8 of arti-
cle 4 as to the members of the legislature, while for the
election to decide whether a new State house should be built
the test was the majority of the votes cast at such election.

Section 18 of article 4 provided, as to creating a public debt, that the question should be submitted to the people, and in order to be passed must receive a majority of the votes "cast for members of the General Assembly at such election." Obviously, therefore, it is necessary, in order to decide the test to be applied in each case, to consider carefully the wording of the constitution on that question, having in mind, in order to reach a proper construction of the section, "the mischief designed to be remedied and the purpose sought to be accomplished by a particular provision." (*Wulff* v. *Aldrich,* 124 Ill. 591.)   It is true, as stated in the majority opinion, that in construing constitutional provisions the true inquiry is, what was the understanding of the meaning of the words by the voters who adopted it? "Still, the practice of consulting the debates of the members of the convention which framed the constitution, as aiding to a correct determination of the intent of the framers of the instrument, has long been indulged in by courts as aiding to a true understanding of the meaning of provisions that are thought to be doubtful." *Burke* v. *Snively,* 208 Ill. 328.   See, also, *Fergus* v. *Russel,* 277 Ill. 20.

Sections 1 and 2 of article 14 of the constitution of 1870, on amendments to the constitution, read, in part, as follows:

"Sec. 1. Whenever two-thirds of the members of each house of the General Assembly shall, by a vote entered upon the journals thereof, concur that a convention is necessary to revise, alter or amend the constitution, the question shall be submitted to the electors at the next general election.   If a majority voting at the election vote for a convention, the General Assembly shall, at the next session, provide for a convention, to consist of double the number of members of the senate, to be elected in the same manner, at the same places, and in the same districts.

"Sec. 2. Amendments to this constitution may be proposed in either house of the General Assembly, and if the

same shall be voted for by two-thirds of all the members
elected to each of, the two houses, such proposed amend-
ments, together with the yeas and nays of each house there-
on, shall be entered in full on their respective journals; and
said amendments shall be submitted to the electors of this
State for adoption or rejection, at the next election of
members of the General Assembly, in such manner as may
be prescribed by law. The proposed amendments shall be
published in full at least three months preceding the election,
and if a majority of the electors voting at said election
shall vote for the proposed amendments, they shall become
a part of this constitution."

It will be seen that the convention, in the first section,
used the words "the question shall be submitted to the
electors at the next general election. If a majority voting
at the election vote for a convention," etc., whereas in sec-
tion 2, for the adoption of an amendment, it provided that
the amendments "shall be submitted to the electors of this
State for adoption or rejection, at the next election of
members of the General Assembly, * * * and if a ma-
jority of the electors voting at said election shall vote for
the proposed amendments." The conclusion of the opin-
ion is that the last wording in section 2 means the same as
the wording in section 1. It seems to me an extraordinary
conclusion, when the members of the convention used a
different wording in the second section from that used in
the first section of the same article, that the two wordings
should be construed as meaning the same thing. If they
intended to mean in the second section, as the opinion holds,
that in order to adopt an amendment there must be a ma-
jority of the electors voting at said general election, why
did they not use the same wording as they did in the first
section, where it is plain that they mean the majority vot-
ing at the general election? Reading and construing these
two sections together, it seems to me that anyone would nat-
urally construe them to mean different things. The words

281 — 3

in the second section, "voting at said election," manifestly mean those voting at the election for members of the General Assembly, and not those voting at the general election, as is specified in the first section of this article.

This construction is greatly strengthened, I think, by the proceedings in the constitutional convention at the time this article was adopted. This whole article was reported by the committee on future amendments to the convention, worded substantially, so far as this question is concerned, as it was finally adopted. There were two minority reports submitted in the convention along with the majority report. The first of these provided, as to the second section, that it "shall be submitted to the people at the next general election thereafter for their adoption or rejection, in such manner as may be prescribed by law, and if a majority of all the electors voting at such election shall vote for," etc. The second minority report provided that the amendment "shall be submitted to the electors at the next general election for their adoption or rejection, and if a majority voting at such election shall vote," etc. (2 Const. Debates, 1310.) Both of these minority reports on this point were rejected, and the majority report, worded as section 2 is now worded, was adopted by the convention. While there was no particular discussion in the convention on the different wording on this point in the minority reports, the conclusion seems to be inevitable that the convention intended to give a different meaning to that part of section 2 here under discussion than is given by the opinion in this case or it would have adopted one of the minority reports, because both of these minority reports stated, in plain words that cannot be misunderstood, the test that the majority opinion holds shall be required before an amendment can be adopted. Such construction, in the light of the rejection of these two minority reports, seems to me to be most unreasonable.

That the convention intended that the test should be the majority votes cast for the members of the General As-

sembly is further supported by the wording of the constitutions of 1818 and 1848, and especially the latter, as to amendments.  Section 2 of article 12 of the constitution of 1848 provided that after an amendment was recommended by the legislature, that body should "submit the same to the people at the next general election, for their adoption or rejection, in such manner as may be prescribed by law; and if a majority of all the electors voting at such election for members of the house of representatives shall vote for such amendment or amendments, the same shall become a part of the constitution."  The second section of article 14 of the present constitution provides that it shall be submitted "at the next election of members of the General Assembly."  The constitution of 1848 provided that it should be taken "at the next general election," but the vote for the house of representatives should be the test.  Under the constitution of 1870 it was taken "at the next election of members of the General Assembly," and to this just quoted part the subsequent words, "said election," necessarily grammatically refer.  Testing the adoption of amendments by the popular vote for the law-making body or one of its branches has been the policy of this State since 1818. In 1870 such had been its policy for fifty-two years.  There is nothing in the wording of section 2 of article 14, or in the debates in the constitutional convention with reference to that section, or in the history of the passage of the section in the constitutional convention, that would lead one to think that the convention intended the test to be the majority of votes cast at the general election.  On the contrary, as already shown, the fact that the wording of this section is different from the wording of section 1, and the further fact that the attempted substitution by the minority reports of the wording argued for in the majority opinion was rejected in the convention, would tend strongly to show that the construction of the majority opinion is necessarily incorrect.

In the light of the various constitutional provisions as to the tests for the election of officials or the adoption of certain questions, what basis is there for the argument that the convention intended by the wording of section 2 to apply the same test as it intended to apply to an entirely different wording as to the calling of the constitutional convention under section 1? Surely, if the convention intended this meaning, in view of all the tests for over fifty years and in view of the wording of the first section and of the rejected minority reports, it would have worded section 2 differently from what it did. To say that it meant by the words "said election" to refer back to the words "the next election of members of the General Assembly," is not only reasonable from the wording of the section by itself, but is the inevitable construction, it seems to me, that must be fairly put upon the wording of section 2 when it is read in connection with the rest of the constitution, having in mind the history of the passage of this article.

The members of the General Assembly are always elected at a general election, but why have inserted the words in said section 2, "at the election of members of the General Assembly," instead of the words "at the next general election," if the votes cast for the members of the General Assembly had nothing to do with the test? It seems to me that the construction given by the opinion absolutely disregards this and requires an intent on the part of the General Assembly that does not anywhere appear in the wording of said section 2. It requires the words "at the next election of members of the General Assembly" to be read as if they meant "at the next general election at which members of the General Assembly are elected," and the legislature certainly would not have used this last wording when it would mean no more than "at the next general election," as it would leave without any meaning the words "members of the General Assembly." This argument applies with equal force to the present wording of said sec-

tion 2 as to the construction placed upon it in the fore-going opinion.

There is another suggestion that tends to strengthen this conclusion. The debates with reference to the adoption of the various sections of said article 14 show that the convention was not attempting to make the adoption of amendments to the constitution more difficult than it had been under former constitutions. The holding of the majority opinion renders the adoption of an amendment by the people more difficult than under either of the former constitutions. While the general consensus of the debate was that perhaps it had been too difficult to make amendments under former constitutions, it was also agreed that the convention did not want to go to the other extreme and open the door so wide that amendments could be made without proper restrictions. No criticism appears to have been made of the tests under the former constitutions as to the adoption of amendments by a vote of the people, and it is extremely difficult to understand how it can be argued that the convention intended to make the provisions as to the adoption of amendments more strict than they were before, by using the wording in section 2 that was finally adopted, when it had repeated opportunities to adopt a wording that would necessarily require the construction as given to the present wording by the majority opinion.

The State board of canvassers is a co-ordinate branch of the government, and any action by said board should be placed on the same basis as action by the legislature. Its acts are therefore entitled to the same presumption in their favor as given to statutes passed by the General Assembly, and this court has repeatedly held that courts will overturn the statutes as being unconstitutional only with great reluctance, and only when it is clear, beyond a reasonable doubt, that the provisions of the constitution have not been followed. The majority opinion holds that the construction placed by that opinion on section 2 of article 14 is the only

clear one. To me it seems that the only reasonable and fair construction of said section is directly opposite from that placed upon it by the opinion. When the members of a court of last resort disagree upon any construction that should be placed upon any provision of the constitution, how can it be fairly said that a given construction is the only clear one?

In my judgment the decision of the circuit court should be reversed and the findings of the State board of canvassers should be approved.

Mr. JUSTICE CARTWRIGHT, also dissenting:

The law has committed to the State board of canvassers the duty and power to determine the result of an election for or against an amendment to the constitution. That board is a branch of the executive department of the government, and its action in determining the number of votes cast is ministerial and not subject to review by the courts, but its decision as to the test fixed by the constitution is judicial in its nature and subject to review by the courts in the exercise of judicial power. Upon such review there is a presumption in favor of its decision which can be overcome and its decision disregarded only when it is clear that the constitution has not been followed. If the question in this case were merely doubtful it would be the duty of the court to uphold the decision of the canvassing board, but that the decision was correct I am not in doubt, whether the intention of those who framed the constitution and the people who adopted it is determined from the language employed, the history and policy of the State respecting the subject matter, or the natural and legitimate relation between the adoption of an amendment to the fundamental law and the choice of members of the legislative branch of the government.

The constitutional amendment section reads in part (art. 14, sec. 2): "Said amendments shall be submitted

to the electors of this State for adoption or rejection, at
the next election of members of the General Assembly, in
such manner as may be prescribed by law. The proposed
amendments shall be published in full at least three months
preceding the election, and if a majority of the electors
voting at said election shall vote for the proposed amend-
ments, they shall become a part of this constitution." An
amendment is to be submitted at the next election of mem-
bers of the General Assembly, and if a majority of the
electors voting at such election shall vote for the amend-
ment it shall become a law and a part of the constitution.
When we consider what is meant by "such election" the
reference is to the election of members of the General As-
sembly, as no other officer or officers or subject is men-
tioned in the section. I see no reason for saying that the
purpose was merely to fix a time for submission of the
amendment, since if that had been the intention the natural
provision would have been that the amendment should be
submitted at an election at which members of the General
Assembly would be chosen, or similar language merely de-
noting time or occasion. The election of members of the
General Assembly, even though other officers are voted for
and other subjects are voted on at the same time, is sepa-
rate and independent, of which a separate return is made
and a separate and independent result is reached, and no
other officer or subject matter is mentioned in the consti-
tutional provision, so that from the language of the con-
stitution, alone, I do not see how a different result could
have been reached by the canvassing board.

The history and policy of the State respecting constitu-
tional changes confirms this view. The constitution of 1818
made no provision for submitting to the people separate
amendments to the constitution, but if two-thirds of the
General Assembly recommended to the electors at the next
election of members of the General Assembly to vote for
or against a convention, and a majority of all the citi-

zens of the State voting for representatives, constituting
one branch of the General Assembly, voted for the conven-
tion, it was to be called. The constitution of 1848 pro-
vided for the submission of amendments, and the provision
for their submission was as follows: "It shall be their
duty to submit the same to the people at the next general
election for their adoption or rejection, in such manner as
may be prescribed by law; and if a majority of all the
electors voting at such election for members of the house
of representatives shall vote for such amendment or amend-
ments, the same shall become a part of the constitution."
The requirement was for its submission at the next gen-
eral election, and members of the General Assembly were
not there mentioned, but the requirement for adoption was
that a majority of all the electors voting at such election
for members of the house of representatives should vote
for the amendment. The test was the vote for members
of one branch, only, of the General Assembly, but the
adoption or rejection was to be determined by votes for a
legislative branch of the government. The present consti-
tution, instead of merely providing for submission at the
next general election, provides that an amendment shall be
submitted at the next election of members of the General
Assembly, and the test of adoption or rejection is the vote
for members of the legislative body not limited to a par-
ticular house. Having fixed the election at which an amend-
ment is to be submitted as the next election for members
of the General Assembly, it certainly would not be expected
that there would be a useless repetition by saying that the
amendment should be adopted if a majority of the electors
voting for members of the General Assembly should vote
for the amendment. That would be a strange and useless
repetition, and the provision being for the submission at an
election of all members of the General Assembly of both
houses, the provision concerning members of one house was
necessarily omitted. No significance whatever can be at-

tached to the fact of the omission of a former limitation to members of the house of representatives. The intent of the people who adopted the constitution will control, but such intent is to be found in the language used, and valuable aid is found in the proceedings of the convention which framed the instrument and adopted the language. (*Wulff* v. *Aldrich,* 124 Ill. 591; *Burke* v. *Snively,* 208 id. 328;. *Fergus* v. *Russel,* 277 id. 20.) Two reports providing for submission of an amendment at the next general election, not limited to any officials or subject matter and which would have accomplished the result reached by the majority in this case, were rejected without debate, while other provisions of the constitution calling for submission of questions to a general election, to be determined by a majority of the whole vote, were debated, and this shows that the convention deliberately adopted the provision for the submission of an amendment at an election for members of the General Assembly. It is not to be presumed that a policy existing from the organization of the State and having a just and proper relation to the subject matter of amendments to the constitution was changed, and changed without consideration or debate.

During the previous history of the State and in the adoption of the present constitution there was an adequate reason for the test adopted in the relation of the General Assembly to amendments of the fundamental law. Each constitution provided, in the first instance, for the consideration of a proposed amendment by the General Assembly and a submission by the law-making body to the people for adoption or rejection. Any amendment to the constitution must originate with the General Assembly and be voted for by two-thirds of the members of each house, and the relation between the vote upon the amendment and the selection of their successors, who, if it is adopted, will carry it into effect by appropriate legislation, is perfectly natural. That having been the policy of the State from its begin-

ning, a conclusion that it was the intention to reverse that policy in the present constitution is, in my judgment, unwarranted.

Contemporaneous construction, where it is clear and uniform, is an aid to solving doubts in the interpretation of provisions of laws and constitutions, but in order to have any force there must have been a uniform, practical construction by those called upon to act under the law or constitution. There has been no such construction as to the provision of the constitution now under consideration. The only interpretation possible is that the result is to be determined by vote for members of the General Assembly, or the alternative one that it is to be determined by the poll-list which shows the total number voting at the election, and the poll-list has never been adopted. The act of March 14, 1877, providing for the manner of proposing amendments and submitting the same to the electors, provided for abstracts of the votes for officers and abstracts of the votes cast for and against the proposed amendment or amendments to the constitution, and the abstracts of votes for or against an amendment were to be addressed and mailed to the Secretary of State. There was no provision for any sort of evidence of the number on the poll-list or the total number voting at the election, and the vote to fill a particular office has never equaled the entire vote at the election, the aggregate votes for a particular office in all cases falling short of the total number. All that the State canvassing board would have under that act would be the number voting for and against the amendment, which would not furnish the test adopted by the majority as the true one. No construction of the constitution with reference to the present question was ever called for or made. In canvassing the vote for the amendment of 1878 and declaring the result the vote for clerk of this court was adopted for comparison. That was contrary to the argument that no single subject can be selected but the result

must be determined by the poll-list. The same thing is true of subsequent amendments when the highest number of votes cast for some particular office was used for comparison. It is directly contrary to the opinion adopted in this case that the highest vote for some officer at an election is the test made by the constitution. It seems to me entirely unwarranted to say that the people in adopting the constitution considered the test either the poll-list, the vote for President of the United States or any other subject matter except the one specified in the constitution, which was the election of members of the General Assembly.

For these reasons I cannot agree with the majority in this case.

---

(No. 11380.—Appellate Court reversed; municipal court affirmed.)
FLORENCE E. SCHAEFER, Plaintiff in Error, *vs.* THE WASHINGTON SAFETY DEPOSIT COMPANY, Defendant in Error.

*Opinion filed October 23, 1917—Rehearing denied Dec. 6, 1917.*