(No. 15890.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANTHONY W. BILLBURG *et al.* Plaintiffs in Error.

*Opinion filed October 28, 1924—Leave to file petition denied Dec. 3.*

1. CRIMINAL LAW—*Attorney General may take charge of proceedings before grand jury.* It is not a valid objection to an indictment that the Attorney General or his assistants took charge of the proceedings before the grand jury. (*People* v. *Looney, ante,* p. 150, followed.)

2. SAME—*what evidence is competent to prove motive in murder trial.* In a trial of several defendants for the murder of the son of a newspaper man who made it a business to protect vice and violations of the law, evidence tending to show that the defendants were also vice protectors and showing the circumstances of hostile feeling between the parties and of a conspiracy of the defendants to murder their opponents, is admissible to show motive.

3. SAME—*evidence may be admitted to show object and purpose of conspiracy.* Where a crime is committed as the result of a conspiracy some latitude is permitted in the proof to show the relations of the parties and the object and purpose of the conspiracy.

4. SAME—*what is sufficient to prove participation in homicide.*
Evidence that a defendant was present at a shooting affray which
was the result of a conspiracy to murder, and that he was brought
to the place in the automobile from which the shots were fired, al-
though there is no clear proof that he himself actually did any
shooting, is sufficient to warrant the conclusion that the defendant
aided or approved the commission of the homicide which resulted
from the shooting.

5. SAME—*when defendants are responsible for homicide result-
ing from conspiracy.* Where several conspire to do an unlawful act
and death occurs in the prosecution of the common object all are
alike guilty of the homicide, as the act of one is the act of all, and
each is responsible for the natural and probable consequences that
may arise from the perpetration of the unlawful act.

WRIT OF ERROR to the Circuit Court of Rock Island
county; the Hon. FRANKLIN J. STRANSKY, Judge, presiding.

DARROW, SISSMAN, HOLLY & CARLIN, and BEN A.
STEWART, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, BEN S. BELL,
State's Attorney, and EDWARD C. FITCH, (CHARLES W.
HADLEY, JAMES J. BARBOUR, and GEORGE W. WOOD, of
counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiffs in error, (hereafter called defendants,) An-
thony Billburg, George Holsapple and George Buckley, with
Daniel Drost, were convicted of the murder of John C.
Looney, in the circuit court of Rock Island county. Bill-
burg's punishment was fixed at twenty years in the peni-
tentiary and the punishment of the other three at fourteen
years in the penitentiary.

John C. Looney was shot and killed about two o'clock
in the afternoon of October 6, 1922, in front of the Sher-
man Hotel, on Seventeenth street, in Rock Island. Seven-
teenth street runs north and south, and the Sherman Hotel
is on the east side of the street. Third avenue is an east
and west street on the south side of the block in which the

hotel is located. Deceased, with his father, John P. Looney, were sitting in their automobile, which was parked facing the entrance to the Sherman Hotel, when defendants drove into Seventeenth street from the east, on Third avenue, in automobiles. They were armed, and turned north on Seventeenth street, drove up in the rear of the Looney car and firing began very quickly. The elder Looney escaped into the hotel and was not injured. The deceased got out of his car and returned the fire but was killed. When defendants drove up to the Looney car they were armed with revolvers and one or more shot-guns and rifles. The Looneys evidently became alarmed and got out of their car. One witness testified the elder Looney, when he saw them, exclaimed, "It has come; it is here; get out of here." Another witness testified he exclaimed, "Here they come; let's get them." Another testified the elder Looney, when he stepped out of his car, said, "Come on, my boy; come inside with me; the jig is up." The number of shots fired was variously estimated at from twenty to fifty. Deceased was hit with three bullets, and with shot from a shot-gun from his shoulder blades to the calf of his legs. The shotgun wounds were not of themselves sufficient to cause death, but one of the bullets penetrated the abdomen and perforated the intestines in fourteen places and was necessarily fatal.

A reversal of the judgment is asked on the grounds (1) the court erred in overruling the motion to quash the indictment; (2) the verdict is contrary to the evidence; (3) the court erred in the admission of testimony for the People; (4) the court erred in giving and refusing instructions; (5) defendants were prejudiced by inflammatory argument of counsel.

It is contended first by plaintiffs in error that the indictment returned by the grand jury is invalid because the grand jury was taken charge of and its deliberations conducted by the Attorney General of Illinois and his assist-

ants, and that the court erred in overruling the motion of plaintiffs in error to quash the indictment. This same question, it is admitted, is also involved in the case of *People* v. *Looney,* (*ante,* p. 150,) and it was there decided contrary to the contention of plaintiffs in error.

The time of the homicide was about two o'clock in the afternoon. The place was one of the most public in the city of Rock Island. We shall not make any attempt to set out the evidence in detail. The proof abundantly warranted the conclusion that there was ill-feeling between the elder Looney and Billburg, and that the bad blood existing between them grew out of the desire of the two men to control vice conditions in the city. The way they sought to control the running of gambling and sporting houses was to promise them protection for weekly payments of sums ranging from $100 to $400. Looney was the proprietor of a newspaper, the *Rock Island News,* which was used as an instrument to enable him and those connected with him to carry out their scheme of protecting vice by levying tribute upon those who engaged in keeping gambling resorts and houses of prostitution. For a time Billburg was enabled to avail himself of the use of the paper, and, as he expressed it, to "throw printer's ink" on anyone who interfered or threatened interference with the business of protecting vice for a money consideration. Finally the relations became hostile between Looney and Billburg, and witnesses testified for the People to threats of Billburg to kill Looney, to his trying to persuade other of his friends to kill him, and advising them how the killing could be accomplished. Billburg was proprietor of a drinking place called the "Long Bar," at which he met men and talked with them about getting Looney out of the way. If the People's evidence is to be believed, Billburg was very hostile toward Looney and desired his death. The Long Bar was on Twentieth street and Third avenue. The automobiles in which defendants went to the Sherman Hotel left Billburg's place about

two o'clock P. M., October 6, and went north on Twentieth street to Second avenue, then west on Second avenue past the jewelry store of Jake Ramser to Eighteenth street, thence south to Third avenue, then west to Seventeenth street, where they turned north to where the Looneys were, in front of the Sherman Hotel. Drost, who has not joined in suing out this writ of error, was picked up by the automobile at Spencer square and went with defendants to the place of the homicide.

It is the theory of the defense that it was not proved defendants were at the time of the homicide seeking the Looneys for the purpose of killing them or one of them, but that defendants were going to a place where a newspaper displayed the score of the world series baseball game then in progress, and that when they arrived at the place where the Looneys were, the Looneys, or one of them, opened fire on defendants, and that what shooting they did was in self-defense.

Several witnesses who saw the affair, or some parts of it, testified for the People and for the defendants. These witnesses did not agree as to the details of the shooting. They told the story as they saw and remembered it. They did not all agree as to where the first shot was fired from. Some said the firing began from an automobile or in the street in front of the hotel and the firing was toward that building, while some of defendants' witnesses testified the first shot was fired from the sidewalk, toward the west. It would be a remarkable circumstance if all the witnesses who saw the affair saw it exactly alike. It was an exciting matter and greatly frightened those who were on the street or within gunshot of where the shooting was taking place. It is undeniable that the Looneys were sitting peaceably in their car, talking with attorney Allen, when defendants drove up in two or possibly three automobiles, armed with revolvers, shot-guns and rifles. When the Looneys saw them they got out of their car and the elder Looney

ran into the hotel. As he did so he was fired at, and the shot or shots shattered glass in the hotel. Deceased sought protection by placing a near-by car between him and defendants, drew his revolver and returned the fire but was quickly shot down.

We have carefully read the testimony, and are of the opinion the conclusion was warranted that defendants armed themselves and started out to find and kill the Looneys, or the elder of them, and that when they located them defendants began the shooting. We deem it an unnecessary task to quote from the testimony. The jury could not reasonably arrive at any other conclusion than that defendants left the Long Bar on a murder expedition and proceeded to carry out their purpose when they discovered their victims. It does not alter the situation that witnesses testified when the elder Looney escaped into the hotel he went up-stairs and he and another fired out of the windows of the building at the men in the automobiles. A circumstance which is irreconcilable with the claim of defendants that they intended no harm but were peaceably on their way to watch the score of a baseball game is that they were heavily armed. None of the defendants who are prosecuting this writ of error took the stand and no explanation is offered of why they armed themselves before leaving the Long Bar. To set out the evidence would only serve to make plain defendants' guilt. It so conclusively justified the jury in finding them guilty that we will not extend this opinion by reciting its substance. We should, perhaps, refer to the testimony of Drost, who is not one of plaintiffs in error.

On the trial defendants offered in evidence a written statement made by Drost to the assistant State's attorney. The substance of his statement is that he was called at his home about one o'clock on October 6 by someone who asked to meet him at Spencer Square Park. He went there and sat on a bench until an automobile came along and someone in it called to him to come to the car. There was one

man in the car and he asked Drost to get in. Drost inquired what was going on, and the man said, "We are liable to get into a fight." Drost said if that was so he ought to have a shooting-iron, and the man in the car told him he did not need one. Drost got in the car and saw a rifle or shot-gun in the back end of it. Before they left the park another man got in the rear seat of the car. Drost said he did not know either of the men. They drove to the front of the Sherman Hotel on Seventeenth street and stopped. He heard someone not in his automobile say, "What is the matter with you? Are you yellow?" Then a shot was fired, which seemed to come from back of the car he was in. There were several shots fired,—one, he thought, by the man in the back seat of the car Drost was in. He saw the elder Looney come to a second-story window of the hotel and run back. About that time Drost was shot in the arm, and he thought it was the elder Looney who shot him. Drost told the driver he was hit and asked to be driven to Billburg's Long Bar, which the driver did, and Drost was then taken to a doctor's office.

At the conclusion of the State's evidence Drost announced his desire to take the stand and testify. He testified defendant Holsapple told him the evening of October 5 Billburg wanted to see him at the Long Bar next day; that he went there about one o'clock on October 6 and saw Billburg, who said to him, "Well, we are going to croak Looney," and that he had the people to do it. Drost went to the park and sat there till Holsapple's automobile came along, when Billburg told Drost to get in that car, which he did. There were two strangers in the car. Billburg's car was in front. One of the men in the car gave Drost a revolver and told him to keep it in his hand. When the automobile arrived where the Looneys were he saw them in their car. The next thing that happened, a shot was fired. He saw a gun in the car ahead of him pointed out and shooting. He said he had a gun in his hand but did no

shooting.   After three or four shots were fired he was hit
in the arm and told the driver to get out of there.   He was
then examined by counsel for the People, and testified he
was in the saloon business six or eight years but retired
from that occupation and worked on the *Rock Island News*
with Looney.   He had difficulty with Looney and quit the
newspaper in March, 1921.   He knew Billburg, visited him
frequently while connected with the newspaper and con-
sulted him about what should be published in the paper.
Billburg would sometimes call Drost two or three times a
week.   Defendant Buckley was for a time associated with
witness on the newspaper.   The inference is warranted
from the testimony that for a time Billburg had a good
deal to say about what should appear in the paper.   The
only purpose of the paper disclosed by the testimony was
its use as a blackmailing sheet to aid those connected with
it in collecting tribute from the underworld and gamblers.
Drost testified that after he quit the paper Billburg told
him Looney had treated him (Drost) wrong and he ought
to kill him.   At different times he urged Drost to kill the
senior Looney by waylaying and shooting him, by throwing
nitro glycerine in Looney's building, by placing dynamite
bombs at Looney's doors with fuse to explode them, and
by placing dynamite on Looney's car in such manner that
it would explode from the car movement.   Twice Billburg
and Holsapple went with Drost late at night to places where
they knew dynamite was kept, for the purpose of procuring
it, but the buildings were closed and they did not secure
any.   On the motion for a new trial Drost again took the
witness stand and repudiated what he testified to at the
trial, and said his testimony was given on the representa-
tion of two investigators for the Attorney General that he
would be protected and taken care of by the Attorney Gen-
eral, but that since the trial Hadley, who represented the
Attorney General, had refused him protection.   Drost tes-
tified he had no talk with Hadley prior to testifying, but

that one of the investigators told him to do the right thing and Hadley would do the right thing with Drost,—stick to him and protect him in every way. He further testified that the statement he made to the assistant State's attorney was false and that he explained to one of the investigators it was untrue.

We see nothing in the story told by Drost at the trial which was incompetent. It differed in some respects from the statement he made to the assistant State's attorney but in other respects agreed with it. Drost gave his testimony on his own motion, and it does not appear that counsel for the State had any intimation that he intended to testify. The story told by Drost at the trial was in part corroborated by the witness James Lannen. It was for the jury to determine what credit should be given Drost's testimony. The fact that after he learned he was to receive no protection from Hadley he repudiated his testimony, in our judgment did not entitle defendants to a new trial, and the court properly so ruled.

Complaint is made that the court admitted incompetent, prejudicial evidence. Billburg appears to have been confined to bed with illness for a considerable period some time before the homicide. Witness Pedigo was permitted to testify that after seeing one of the editors of the *Rock Island News* he went to Billburg's home and told him he wanted to start a poker game. Billburg said he would secure him protection and would do so for a division of the profits. Witness opened the game and paid Billburg from $50 to $200 per week. Louis Ortell testified for the People that in the latter part of 1920 or first of 1921 he was at Billburg's house, and Billburg said there were a lot of near-beer places, gambling and sporting houses running, and they had been running a long time without paying anything for protection. Billburg gave the witness a list of prices they should pay,—$150 a month for near-beer places and $200 to $400 for sporting houses. He said all gambling houses

were to be closed except one, and that was to be operated by Billburg. He instructed witness to see chief of police Cox about what he (Billburg) had told witness, and when witness told Cox he threatened to throw witness out of his office. Witness reported the fact to Billburg, and he said maybe Cox wanted him (Billburg) to throw some ink on him. He said that might do Cox some good; that he had always been in his (Billburg's) road. Billburg told witness to send the men whose names were on the list he gave witness, with amounts they were to pay, to him, and if they did not pay, witness was to collect the money from them. Billburg threatened to write Cox and others up in the newspaper, and said if he did they would leave town. Billburg often called witness up and asked if he had seen this man or that woman, and said they had not been paying anything. Witness collected money from several on the list and gave it to Billburg. The elder Looney appears also to have interfered or got in the way of Billburg's collecting graft from vice. Billburg asked witness if it was true that Looney was going to present him (Billburg) to the grand jury. Witness said he did not know. Billburg asked witness why he did not come to see him about the gambling houses, and witness said he had nothing to do with it. Billburg inquired who did, and witness told him Looney. Billburg said he would have given $6000 for it. Witness said almost every time he was at Billburg's he called up Drost. Some other witnesses testified for the People to talking with Billburg about paying him money for vice protection. All such evidence defendants insist was incompetent and irrelevant to prove the crime charged.

It clearly appears from the evidence that Billburg and the elder Looney were rival vice lords, and they became very bitter toward each other. Most, if not all, of defendants had at times previous to the homicide had some connection with the *Rock Island News,* which was owned by the elder Looney. At the time of the trial of this case

there was pending in the circuit court a suit brought by Looney against Billburg, Drost, Buckley and others for libel, in which the damages were laid at $50,000. The testimony was objected to on the ground that it did not tend to prove the crime charged but tended to prove independent criminal acts. The court instructed the jury, on behalf of defendants, such evidence was admitted solely on the question of motive for the killing and should not be considered for any other purpose, and should be considered by the jury only on the single question of motive. It was competent for the People to prove as a part of the case the relations between the parties, and the motives, if any, the defendants had for committing the crime. If the evidence was admissible to prove motive, the fact that it tended to prove guilt of other offenses did not render the testimony incompetent. The competency of the proof is sustained by *People* v. *Cione,* 293 Ill. 321, *People* v. *Strause,* 290 id. 259, and *People* v. *Watkins,* 309 id. 318. In *People* v. *Becker,* 215 N. Y. 126, the homicide grew out of a disagreement between vice protectors in New York, and there is much in that case which is similar to this case, and evidence similar to that admitted in this case was held not erroneous. Here it was the State's claim that defendants formed a conspiracy to murder Looney and that in carrying out that conspiracy the homicide was committed. The proof abundantly tends to sustain that theory, and it is well established that when a crime is committed as the result of a conspiracy, some latitude is permitted in the proof to show the relations of the parties and the object and purpose of the conspiracy. (*People* v. *Nall,* 242 Ill. 284; *People* v. *Seefeldt,* 310 id. 441.) While it may not have been essential for the State to prove the conspiracy and motive for the homicide, in view of the fact that defendants' guilt was proven by the testimony of eye-witnesses it was entirely competent to do so and there was no error in admitting the proof.

The claim that there was no evidence to prove defendant Buckley's guilt we think is without merit. While the proof is not clear that he actually did any shooting, he was in the front automobile, and there was testimony that shots were fired from that car. Buckley was one of the conspirators, was present when the homicide was committed, and the evidence warrants the conclusion that he aided or approved the commission of the crime. *People* v. *Marx,* 291 Ill. 40; *Spies* v. *People,* 122 id. 1.

Jake Ramser, who was not indicted, was present at the killing of John C. Looney. Ramser had previously had trouble with John P. Looney. He came to the scene of the homicide with defendants. Mrs. Carter testified she saw him hanging on the side of the car as it approached Seventeenth street, and near the corner of that street he got off the car near the curb. He walked about half way toward the street car track in Seventeenth street, then turned and began shooting toward the ground in front of the hotel. Other witnesses saw Ramser on foot going toward the scene of the crime and of his joining in the shooting. He used a revolver. The mortal wound was made by a bullet, but we have already stated that there were many shot-gun wounds in the body of deceased, so it is evident he was shot with more than one kind of gun.

Defendants contend the proof at least tended to show deceased was killed by Ramser without any concert on the part of defendants, and that the court erred in giving People's instructions 11 and 14 and in refusing defendants' instructions 56 and 60. Instructions 11 and 14 given for the People were as follows:

11. "As to the law with reference to the subject of common design and criminal intent in homicide cases, the court instructs the jury that while it is essential in order to render one guilty of homicide as an accessory before the fact, that he share in the criminal intent of the actual perpetrator, yet it is not necessary that his participation as an

accessory should have been by preconcert with the one com-
mitting the deed.   Nor is it necessary that the accessory
shall have orginated the common design.   A common de-
sign need not have existed for any particular length of time
before the commission of a homicide.   It is sufficient if
there be a community of purpose between the one accused
and the direct actor at the time the homicide was commit-
ted.   All who join in a common design to kill, whether in
a sudden emergency or pursuant to a conspiracy, are lia-
ble for the acts of each of their accomplices in furtherance
thereof; and accomplices are so liable, even though the
perpetrator who actually commits the homicide cannot be
identified, if such act of killing is committed in pursuance
of a common design to take the life of the deceased."

14. "The court instructs the jury, as a matter of law,
that if several persons conspire to do an unlawful act and
death occurs in the prosecution of the common object, then
unless such death is justified or excused as defined in these
instructions, all are alike guilty of the homicide.   The act
of one of them done in furtherance of the common design
is, in the consideration of the law, the act of all, and he
who being present, aids, abets, assists, advises or encourages,
or not being present hath advised or encouraged another to
do an illegal act, is responsible for all the natural and prob-
able consequences that may arise from its perpetration."

Instructions 56 and 60 asked by defendants, which the
court refused, are as follows:

56. "The court instructs you that if you believe from
the evidence that Jacob Ramser at the time of the shooting
of John Conner Looney was acting independently of the de-
fendants, and not in combination or agreement with them,
then the defendants cannot be held responsible in this case
for anything done by said Ramser at the time and place
in question."

60. "The court instructs you that there is no presump-
tion that the defendants and Jacob Ramser were acting in

concert at the time and place in question, nor is the burden upon the defendants to prove that they were not acting in concert with said Ramser, but before they can be held responsible for anything done by Ramser the People must prove beyond all reasonable doubt that they were acting in concert with him.  If the People have not made such proof you should not hold the defendants responsible for anything done by Ramser."

The court committed no error in giving the People's instructions referred to and refusing defendants' instructions 56 and 60.  *Brennan* v. *People,* 15 Ill. 511; *Spies* v. *People, supra.*

Complaint is made of the court's action in refusing several other instructions requested by defendants.  Defendants asked the court to give the jury thirty-nine instructions.  The court gave twenty-two and refused seventeen.  What was contained in some of the refused instructions was embraced in those given, and others refused did not state correct principles of law or were misleading under the evidence given at the trial.  It is clear the defendants were not prejudiced or denied any right by the rulings of the court in giving and refusing instructions.

It is also insisted defendants were prejudiced by inflammatory remarks of counsel for the State to the jury.  We do not think this complaint sustained by the record and it does not require discussion in detail.

Considering the record as a whole it shows defendants had a fair and impartial trial.  All the testimony considered, we think it abundantly sustains the conviction.  That the jury were not misled or their minds inflamed or unduly prejudiced against defendants appears from the punishment fixed by the verdict.  After full consideration of the record we do not see how the jury could have reasonably returned any other verdict than that defendants are guilty.

The judgment is affirmed.     *Judgment affirmed.*