THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES SHADER *et al.* Plaintiffs in Error.

*Opinion filed June 22, 1927.*

1. CRIMINAL LAW—*unchanged portions of amended statute are not regarded as a new law.* Where a statute is amended without change in parts of it, the portions repeated, either literally or substantially, are regarded as a continuation of the existing law and not as the enactment of a new law on the subject.

2. SAME—*repugnant statutes will be so construed that both shall stand, if possible.* Where two acts are seemingly repugnant they should be so construed, if possible, that the later one may not operate as a repeal of the former by implication, and in all such cases if a construction can reasonably be given by which both acts can stand that construction will be adopted.

3. SAME—*section 14 of division 13 of the Criminal Code, as amended in 1913, provides for continuance of trial into succeeding term notwithstanding act of 1915.* Section 14 of division 13 of the Criminal Code, as amended in 1913, provides for continuance of a criminal trial into a succeeding term of the circuit court notwithstanding the act of 1915 fixing the terms of the circuit courts provides that such terms shall close on or before certain dates, and under the amendment of 1913 the court may proceed with a trial at a term succeeding that at which it was begun, without any order or other affirmative action for that purpose.

4. SAME—*statutes should be so construed as to give effect to object or purpose.* Statutes should be read and understood according to the natural and most obvious import of the language used, without resort to subtle or forced constructions for the purpose of limiting or extending their operation, and the object of a statute should be borne in mind, giving it a construction which will effect its purpose rather than defeat it, where it is susceptible of more than one construction.

5. SAME—*what may be shown when crime charged is result of conspiracy.* Where a crime is committed as the result of conspiracy some latitude is permitted in the proof to show the relations of the parties and the object and purpose of the conspiracy.

6. SAME—*when reference to failure of defendants to testify will not require reversal.* Counsel for the prosecution are not permitted to make any reference to or comment upon the failure of a defendant to testify, but where objections are promptly sustained

to such reference in the argument of the State's attorney and the court instructs the jury that the neglect or failure of a person charged with crime to testify should not create any presumption against him the improper reference will not require a reversal, where, under the evidence, the jury could not reasonably have found any other verdict than one of guilty.

7. SAME—*abstract should show all the instructions given.* To determine whether an instruction is erroneous it must be considered in connection with all the other instructions given in the case, and error cannot be predicated on the giving, refusal or modification of instructions unless all of them are set forth in the abstract.

8. SAME—*instructions should be considered together.* While an instruction which mis-states the law cannot be cured by another which correctly states the law on the same subject, an instruction which is merely incomplete can be supplemented by other instructions, and error in one or more instructions will be regarded as harmless if it can be seen, when all the instructions are considered as a series, that no injury has resulted to the party complaining.

WRIT OF ERROR to the Circuit Court of Will county; the Hon. FREDERICK A. HILL, Judge, presiding.

JOSEPH KEIG, A. A. OFFERMAN, JOHN H. GARNSEY, WILLIAM C. MOONEY, and FRANCIS J. LOUGHRAN, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, HJALMAR REHN, State's Attorney, MERRILL F. WEHMHOFF, and JAMES E. BURKE, (ROBERT W. MARTIN, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Charles Shader, Walter Stalesky, (alias William Stalkowsky,) Charles Duschswski, (alias Charles Tamulis, alias Charlie Slim,) Bernardo Roa, Robert Torrez, (alias Robert T. Tjeda,) James V. Price and Gregerio Rizo, (alias John Rizo,) inmates of the new penitentiary, were indicted in the circuit court of Will county for the murder, on May 5, 1926, of Peter Klein, the deputy warden of that institution.

Price escaped and was not apprehended. A jury trial resulted in verdicts finding the other defendants guilty and fixing the punishment of each at death. Motions for new trial and in arrest of judgment were made and denied and judgments were rendered and sentences of death pronounced upon the several verdicts. The six defendants so convicted were allowed a writ of error and jointly prosecute the writ upon a single transcript of the record.

The site of the new penitentiary, known as Stateville, near Joliet, in Will county, comprises sixty-seven acres, measuring approximately fifteen hundred feet from north to south and eighteen hundred feet from east to west, and is enclosed by a stone wall thirty feet in height and one and one-quarter miles long. At the center of the east wall the administration building is situated. About one thousand feet west of the administration building stands the dining hall, which is circular in shape and has a diameter of about two hundred feet. Completed cell houses "D," "E" and "F" are situated southwest, west and northwest, respectively, of the dining hall. West of cell house "E" stands a building which includes the laundry, bath-room and clothing department. Southwest of cell house "D" is another building one-third of which is occupied as a shoe shop. The solitary building is situated about four hundred feet northeast of the dining hall. The east or main entrance to the penitentiary is located at the center of the administration building. A wagon and railroad gate is provided near the center of the south wall. The solitary building faces west. It has only one entrance, and that is located at the center of the front of the building. Upon entering the building a person first passes through double doors, which open out or to the west. Nearly a foot beyond is another set of double doors built of steel bars. These doors open east into the vestibule, a room about nine by ten and one-half feet. There are two benches in the vestibule—one along the north and another along the south wall. Through

double doors of steel and glass the vestibule opens into the
lobby or reception room, which is approximately twelve by
twenty-four feet, the greater dimension running north and
south. Directly opposite the vestibule in the east wall of
the lobby is a single steel and glass door. Beyond this door
is a passageway about four feet long, at the east end of
which is a single door of steel bars. This door opens into
the portion of the building called the solitary proper. The
three sets of double doors between the entrance to the build-
ing and the lobby, and the two single doors between the
lobby and the solitary proper, are placed on a straight east
and west line. Through a door in the south wall of the
passageway access to the basement is gained by a stairway.
The solitary proper has a center aisle, which is twelve feet
wide and runs seventy-two feet east from the single door
of steel bars at its west end. This portion of the building
has twenty cells. Those north of the aisle are numbered
from 1 to 10, beginning with the west cell, and those south
of the aisle are numbered from 11 to 20, beginning with
the east cell. Each cell has two doors, which open into the
aisle. The outer door is a blind one while the inner door is
built of steel bars. Adjoining the lobby or reception room
on the south is the deputy warden's office, which is a room
about eleven by fifteen feet, the latter dimension running
east and west. Two separate single doors were built in the
south wall of the lobby to gain access to the office, but of
these two doors the east one was kept closed. The right
end of the deputy warden's desk was set against the south
wall of the office. The space between the desk and the
west wall of the building was three feet. When seated at
his desk the deputy warden faced east and the person in-
terviewing him sat on the opposite side of the desk and
faced west. North of the lobby are two rooms of equal
size. Access to each of these rooms is gained through a
steel and glass door, on the inside of which, to cover the
glass portion, is a shade operated on a spring roller. The

west room, furnished with a cot, was occupied by Sam Odom, an inmate of the penitentiary and the janitor of the solitary building. The east room was used for storage purposes. About two feet north of the east door of the lobby stood a desk. The left end of the desk was placed against the east wall of the lobby. Chester J. Larson, an inmate, was the deputy warden's clerk and he worked at this desk. When so occupied Larson faced south and could see the deputy warden at his desk, and by leaning slightly to the west Larson could see the person sitting on the east side of the deputy's desk. Inmates who sought interviews with the deputy warden occupied the benches in the vestibule while they waited. He could not see them from his office while they were so seated in the vestibule but Larson could, and the deputy warden usually asked Larson whether any persons were waiting for him.

On May 5, 1926, the new penitentiary had about one thousand inmates, who were supervised by forty-five or forty-six keepers. Shader, Duschswski, Roa, Rizo and Torrez were employed in the shoe shop, of which Albert L. Shawmaker was the keeper. Stalesky was a runner in the clothing department, which was in charge of C. E. Bryant. Jacob Judnich was the keeper of the solitary department. An inmate who desired to have an interview with the deputy warden made a request therefor upon his keeper. This request was transmitted to Larson, the deputy warden's clerk, who in turn presented it to his superior. If the request was granted the deputy warden sent a slip or ticket to that effect by Albert Franzen, an inmate who ran his errands, to the keeper of the particular department. The keeper noted on the ticket the time of the inmate's departure and handed it to him for presentation to the person designated. The officer to whom the slip was presented endorsed upon it the time of its receipt and retained the slip.

On the morning of May 5, 1926, there were present in the solitary building, besides certain prisoners, Judnich, the

keeper, Odom, the janitor, Larson, the clerk, and Franzen, the runner. Peter Klein, the deputy warden, arrived at his office shortly after eight o'clock. When he entered both Larson and Franzen were in the reception room. Roa, Rizo and Torrez had asked for interviews with the deputy warden. Their requests were granted, slips for that purpose were made out and Franzen was directed to deliver them to Shawmaker, their keeper. Franzen performed this duty. About the same time Stalesky brought to Shawmaker similar requests signed by keeper Bryant for the presence of Duschswski and Shader at the laundry building. Shawmaker inquired of Duschswski why he was wanted at the laundry, and he answered that Bryant desired that he change his shoes or shirt. Bryant had not issued slips for Duschswski and Shader nor had he sent Stalesky after them. A number of blank request slips bearing Bryant's signature were kept in his desk. Some of these slips had been surreptitiously taken and two of them were fraudulently used to allow Duschswski and Shader to leave their place of employment.

Roa, Rizo and Torrez left the shoe shop between 9:05 and 9:10 o'clock ostensibly to interview the deputy warden. Duschswski and Shader left about five minutes later. Immediately afterwards these five men and Stalesky and Price met outside of the solitary building. Torrez was the first to enter the deputy warden's office and engaged in conversation with him. Duschswski, Price and Roa shortly afterwards followed as far as the reception room and stood at the north, center and south, respectively, of the double doors between the vestibule and the lobby. Odom heard Klein say to Torrez, "I will attend to that." Torrez arose, and instantly Duschswski, Roa and Price rushed towards the deputy warden's office. The first two succeeded in entering the office but Price was temporarily prevented from doing so by Odom. Larson, who was at work at his desk, saw Duschswski rush at Klein while he was sitting in his

chair and strike him on the head three times with an iron bar. Emil A. Rooth, an inmate, who waited in the vestibule for an interview with the deputy warden, was pushed into the lobby and saw Duschswski strike Klein on the head and Roa draw a knife from Klein's body. Judnich saw Klein covered with blood, his hands over his head, and Duschswski standing in front of him with an iron bar in his hand. Klein staggered, crumpled and fell to the floor of his office. Torrez had left the room but soon returned with a weapon in his hand. Later, he and Shader stood guard at the double steel doors of the vestibule to prevent all persons who entered, as well as those already inside, from leaving the building. When Larson saw what was taking place he ran into the storeroom behind his desk. He was immediately followed by Stalesky and Rizo, the latter with a knife in his hand, and both commanded Larson to go into the solitary proper or suffer death. They started to escort him there and he obeyed. Judnich and Odom were in the lobby armed with clubs and engaged in a fight with Price, Roa, Stalesky and Rizo. Both Judnich and Odom broke their clubs. Judnich was struck on the head and stabbed in the arm and Rizo stabbed Odom in the groin with a scissors. Judnich and Odom retired to the solitary proper and Judnich locked the inner door.

After Judnich, Odom and Larson were in the solitary proper behind the locked door, Duschswski, Roa, Rizo, Stalesky and Price came to the door and made repeated demands upon Judnich for the keys and threatened to kill him and his two companions if he failed to comply. Judnich refused to surrender the keys. Unsuccessful, Duschswski, Roa, Rizo, Stalesky and Price went to the deputy warden's office and brought Klein to the door of the solitary proper, and, supporting him, ordered that he command Judnich to deliver the keys to them. Klein, who was covered with blood and unable to speak, merely nodded his head. Judnich still refused to part with the keys, and Duschswski,

who had a knife in his hand, said, referring to Klein, "Let's kill the big———." Stalesky repeated the oath, snatched the knife out of Duschswski's hand and stabbed Klein in the groin. Klein fell over upon Larson's desk, and Duschswski, Roa, Rizo and Stalesky dragged him into Odom's room and left him there. They returned to the door of the solitary proper, again demanded the keys and threatened Judnich, Odom and Larson with death. Rizo said they had killed the deputy warden and would kill them too if they did not surrender the keys. Judnich still refused to comply with the demand, and Stalesky then said that he would seek one of the captains of the penitentiary. Stalesky found captain John M. Keeley at cell house "D" and told him that deputy warden Klein wanted to see him. Keeley, failing to reach the deputy warden by telephone, walked to the solitary building, and upon entering was seized by Duschswski, Stalesky and Price. Duschswski had a bolt, Stalesky a knife and Price some other weapon. Roa, Rizo, Shader and Torrez were in the vestibule. Keeley was searched for a gun but had none on his person. He was pushed into Odom's room, where Klein lay on a cot, wounded and bleeding. The plaintiffs in error and Price were present, armed with iron bars, knives and shears, and they told Keeley that they had already killed the deputy warden and that they would kill him if he did not do what they demanded. Keeley was then taken to the door of the solitary proper and was told to unlock it. He did not answer promptly and Duschswski urged Stalesky to kill him. Keeley then said to Judnich, "Now, you know what has been done here; you might as well give them the keys; this is the only chance for us." While standing at the door Keeley raised his hand and cut it on a knife which Torrez held. After some hesitation Judnich unlocked the door and surrendered the keys. Duschswski, Stalesky, Roa and Rizo rushed into the solitary proper and locked Judnich, Odom, Larson and one Burns in cell No. 20. Burns had been

confined in cell No. 10, but Judnich, seeking assistance, had released him. Fourteen inmates who had been kept under guard in the lobby and deputy warden's office were imprisoned in cell No. 18. After placing all these men in the two solitary cells Price told Duschswski that the front of his shirt was covered with blood and that he should change it. Duschswski did so and left the shirt he removed on the clerk's desk. The plaintiffs in error and Price locked the east door of the reception room and with Keeley in their custody proceeded to the south entrance to the penitentiary grounds. As they approached the inner gate, and when about fifteen feet from it, the gate was opened. When they had passed that gate one of the plaintiffs in error told Keeley to telephone for an automobile. He complied by calling the guard at the east or main entrance, and after a brief interval the deputy warden's automobile, driven by one Cassidy, a trusty, arrived. Captain Hammermeister, keeper of outside details, took the names of the seven men. The outside gate was then opened by the wall guard and the men were driven outside of the prison enclosure.

Thomas Hartigan, a keeper employed at the east or main gate, saw the automobile with Keeley, Cassidy, Price and the plaintiffs in error pass that gate about 10:45 o'clock. It was Hartigan's duty to relieve Judnich for his noon meal. Hartigan arrived at the solitary building about 11:00 o'clock and found the two doors leading to the cells locked. There was no one in the reception room. He entered the deputy warden's office and saw blood on the walls and floor and the deputy's hat in a corner of the room. He found the door to Odom's room locked, but by looking under the shade over the glass panel in the door he could see Klein on a cot facing east. He then started toward the dining hall to get some keys and met captain Hammermeister. They returned to the solitary building and found Judnich, Odom, Larson and Burns locked in one cell and fourteen inmates in another. Hartigan also found a handle loaded

with lead in the passageway between the reception room and the solitary proper. This club prior to May 5 stood in a corner in the deputy warden's office.

The character of the work in the shoe shop required the men employed there to use knives and shears in the performance of their duties. Accordingly, on the morning of May 5, Shawmaker, the keeper, gave the plaintiff in error Shader five knives, John Rezler, an inmate, who was the floorman in the shop, eighteen knives, and D. W. Becker, another inmate, who was the assistant foreman in the fitting department, seventeen pairs of shears, for distribution among the men so employed. An accounting of these knives and shears was made about 11:00 A. M. Of the five knives which had been delivered to Shader four were returned by a man named Paige. Rezler collected all but two of the knives he had distributed, and of the two unaccounted for, one had been given to Duschswski and the other to Mike Ferrare, an inmate, who missed his knife during the forenoon and immediately reported his loss to keeper Shawmaker. The shears which Becker had distributed were returned except the pointed halves of the two pairs given to Roa and Rizo. Shawmaker discovered that three knives and parts of two pairs of shears were missing and that Duschswski, Rizo, Roa, Shader and Torrez were absent.

Frank L. Kness was next in rank to deputy warden Klein and on the day in question was in charge of the cold storage department. About 11:30 o'clock he was informed that several keepers missed men out of the shops. He went to the solitary building, reaching it just before noon, and found much confusion there. The telephone in the reception room had been torn from the wall. The door to Odom's room was locked, but a crack in the shade over the glass portion permitted him to see Klein on a cot facing south. Unable to obtain the keys quickly enough he had

the panel chiseled out in order to gain access to the room, and when the door was opened he saw that Klein was dead. Kness notified the coroner, State's attorney and sheriff. Upon his inspection of the building he found, among other things, a knife handle, a knife blade, two iron bars, a convict's cap and vest and two shirts,—one belonging to Duschswski and the other to Roa. In the deputy warden's office he discovered a number of blood spots on the walls and office furniture. A drawer in Klein's desk, which he always kept locked, had been opened by force. In Odom's room there was much blood and the pillow on the cot was saturated with it.

Dr. William R. Fletcher, the penitentiary physician, arrived at the solitary building about 12 :40 o'clock and found deputy warden Klein dead. An examination of Klein's body by Dr. Fletcher and Dr. Kingston, the coroner, disclosed the following injuries: Three skull fractures, of which one was a basal fracture; a puncture in the right lower jaw four inches deep; a one-inch wound to the left of the sternum, which penetrated into the heart; a four-inch cut on each side of the breastbone, between the third and fourth ribs, which did not reach the membrane surrounding the heart; a wound one inch inside and two inches below the left nipple; another wound on a level with the navel and directly below the left nipple, which perforated the peritoneal cavity and also the intestines; and a three-inch cut in the right groin, which extended through the abdominal wall, perforating the small bowels and discharging about a foot of the intestines. Dr. Fletcher expressed the opinion that any one of four or five of these wounds proved fatal and that Klein had been dead at least an hour when the examination was made.

After their escape from the penitentiary the plaintiffs in error and Price, with Keeley and Cassidy in their custody, proceeded in the deputy warden's automobile to some point near Marseilles, in LaSalle county, where Price and

Shader left the other occupants of the car. Cassidy was then directed to drive on and to turn on a side road. When they had gone about two miles on that road Keeley and Cassidy were told to leave the car. Duschswski, Rizo, Roa, Stalesky and Torrez took them through the woods for some distance and handcuffed them to trees, with the threat that if they made any noise for half an hour they would be killed. About two and one-half hours later Keeley and Cassidy were released and they returned to Joliet.

Five of the plaintiffs in error, Duschswski, Rizo, Roa, Stalesky and Torrez, later abandoned the deputy warden's automobile in a ditch. On the same day, at about 10:00 o'clock P. M., they were seen passing through Leonore, a village in LaSalle county about twenty miles southwest of Marseilles. Police officers from the city of Streator followed and attempted to arrest them. Roa, armed with a shot-gun and shooting, was shot and captured, and one of the officers was injured. Torrez was arrested the same night in a plowed field near Leonore. Stalesky and Rizo were discovered the next day hiding in the hayloft of a barn near the same village. Just before their capture Stalesky pointed a shot-gun at the deputy sheriff who was about to arrest him and pulled the trigger, but the shell failed to explode. A dagger was found in this hayloft. Shader was taken into custody near the city of LaSalle on May 8. Duschswski escaped to Mexico and was captured in that country across the border from Nogales, Arizona, in August and brought back to Joliet.

Of the plaintiffs in error only Stalesky and Duschswski took the witness stand. Stalesky testified that prior to May 5 Duschswski inquired of him whether he desired to escape, stating that the plan had been arranged and the south gate would be opened for them; that later he, Stalesky, met deputy warden Klein and informed him that a number of men employed in the shoe shop were plotting to escape; that Klein told him to bring the men to him

and he would take care of them; that the men were brought
to the deputy warden's office on the morning in question
and soon started to fight; that he saw Duschswski strike
Klein, and that he exclaimed, "Boys, don't hurt the dep-
uty!" that he went to captain Keeley and told him he was
wanted at the solitary building but did not tell him what
had happened, because he thought Keeley knew about it;
that the keys were obtained from Keeley, and that, after
locking the men in the solitary cells, he and the other plain-
tiffs in error escaped through the south gate.    Stalesky
admitted that he had a knife when he was in the solitary
building on the morning of May 5, that he had obtained
the knife from the laundry and had hidden it in his cell,
and that he had a gun at the time of his capture.

Duschswski testified that he had been approached by
some officer of the penitentiary, whose name he refused
to divulge, with a plan for the escape of himself and a
number of other convicts; that the plan required them to
go to the solitary building first in order to compromise the
deputy warden and then they would be permitted to escape
through the south gate; that on the morning of May 5 the
same officer inquired how he felt, and when informed that
he, Duschswski, had a headache, the officer gave him some
medicine in the form of cigarettes, and that he smoked four
or five of them, with the result that he became irresponsible
and had no recollection of what happened until he took part
in handcuffing either Keeley or Cassidy to a tree in LaSalle
county.    Duschswski then detailed at considerable length
and in a disconnected way his experiences on his escape
from the penitentiary.

The only other evidence on the part of the defendants
was that of Harold Hanover, a convict, who had distributed
shears at the shoe shop about a month prior to the fifth
day of May.    He testified that he delivered shears No. 5
to Torrez and had seen them again about ten days prior
to the trial, and that the shears which Roa had in the work-

room were seven or eight inches long and did not resemble any of the exhibits in evidence. On cross-examination he admitted that he did not know what shears Roa, Rizo or Torrez had on May 5, 1926.

Plaintiffs in error make the following contentions for the reversal of the trial court's judgments: First, that the circuit court of Will county was without jurisdiction to hear and determine any criminal case at the November term of that court, and consequently that the verdicts and judgments are void; second, that the court erred in admitting certain evidence of what occurred in LaSalle county subsequently to the escape of plaintiffs in error from the penitentiary because those occurrences were too remote and had no relevancy to the issue to be determined, namely, whether plaintiffs in error were guilty of the crime charged in the indictment; third, that a juror's interruption of plaintiff in error Duschswski while he testified evinced hostility on the juror's part and denied plaintiffs in error a fair and impartial trial guaranteed by the constitution; fourth, that the State's attorney and his assistant in their final arguments to the jury made comments which were highly prejudicial and constitute reversible error; fifth, that a prejudicially erroneous instruction was given to the jury at the request of the prosecution; sixth, that there was no evidence of any intention to use force or violence which would necessarily or even probably cause the taking of human life; and seventh, that the evidence concerning the murder of the deputy warden was circumstantial and did not exclude the reasonable hypothesis that the crime was committed by some person other than one of the plaintiffs in error.

*First*—The selection of the jury in the instant case began on October 18, 1926, at the September term of the circuit court of Will county. The trial progressed until November 26, when the verdicts were returned. On December 21 the judgments were rendered and sentences of death pronounced. The November term opened on the fif-

teenth day of that month and was concluded on the thirty-first day of December. No order was entered continuing the cause from the September to the next or the November term or permitting the trial to proceed at that term. Want of jurisdiction, it is asserted, resulted, and the contention is based upon section 13 of the act entitled, "An act to revise the law concerning the time of holding the terms of circuit court and of the calling of juries in the several judicial circuits, exclusive of Cook county," approved June 23, 1915, in force July 1, 1915, (Laws of 1915, p. 353,) which, to the extent that it is pertinent, provides: "Twelfth circuit. In the county of Will, on the first Mondays of January, March and May, which terms shall close on or before the last Saturday of June, the third Monday of September, and the third Monday of November, at which term no grand jury shall be summoned and no criminal business be transacted." By section 13 of the act approved June 11, 1897, in force July 1, 1897, entitled, "An act to amend 'An act concerning circuit courts and to fix the time for holding the same in the several counties in the judicial circuits of the State of Illinois, exclusive of the county of Cook,' approved May 24, 1879, in force July 1, 1879," (Laws of 1897, p. 191,) it was provided: "Twelfth circuit. In the county of Will, first Monday of January, first Monday of March, first Monday of May, which term shall close on or before the last Saturday of June, third Monday of September and third Monday of November, at which term no grand jury shall be summoned and no criminal business be transacted."

Prior to March 21, 1913, section 14 of division 13 of the Criminal Code, (2 Jones & Addington's Stat. Ann. p. 2231,) provided that "the court in which a trial for a criminal offense is pending may continue in session until the verdict is rendered and judgment entered, notwithstanding the judge may be required by law to hold court in another county before the conclusion of such trial." An act approved and in force March 21, 1913, (Laws of 1913,

p. 258,) amended this section by adding thereto: "and notwithstanding the fact that the time occupied by such trial, and the conclusion thereof may extend into and overlap a succeeding term or terms of the court in which such trial is pending."

When the General Assembly amends a statute and no change is made in parts of it, the repeated portions, either literally or substantially, are regarded as a continuation of the existing law and not as the enactment of a new law upon the subject. (*People* v. *New York, Chicago and St. Louis Railroad Co.* 316 Ill. 452; *People* v. *Lloyd,* 304 id. 23; *Svenson* v. *Hanson,* 289 id. 242.) Section 13 of the act of June 23, 1915, in so far as the terms of the circuit court of Will county are concerned, was therefore a continuation of section 13 of the act of June 11, 1897, and the provision that "no grand jury shall be summoned and no criminal business be transacted" in the county of Will at the term beginning on the third Monday of November, has been in effect, unchanged, since July 1, 1897.

It is a maxim in the construction of statutes that where two acts are seemingly repugnant, they should be so construed, if possible, that the later one may not operate as a repeal of the former by implication, and in all such cases if a construction can reasonably be given by which both acts can stand, that construction will be adopted. (*People* v. *New York, Chicago and St. Louis Railroad Co. supra; City of Rockford* v. *Schultz,* 296 Ill. 254; *People* v. *Wabash Railroad Co.* 276 id. 92.) The act of March 21, 1913, which permits the court in which the trial for a criminal offense is pending to continue in session until the verdict is returned and the judgment is rendered, notwithstanding the trial may extend into and overlap the succeeding term or terms of the court, is a modification *pro tanto* of section 13 of the act of June 23, 1915, fixing the time of holding the terms of the circuit court in Will county. Obviously, the General Assembly intended that both acts

should stand, and while no grand jury should be summoned or criminal business be initiated at the November term of the circuit court of that county, yet that a trial begun at an earlier term might continue into a succeeding term or terms until it was concluded. The prolonged trial of the instant case demonstrates both the necessity and wisdom of the act of March 21, 1913.

Plaintiffs in error, however, further insist that in any event an order should have been made and entered of record at the conclusion of the September term continuing the cause to the succeeding or November term of the trial court, and that by reason of the failure to enter such an order the court's jurisdiction of the cause was lost or terminated. Statutes should be read and understood according to the natural and most obvious import of the language used, without resort to subtle or forced constructions for the purpose of limiting or extending their operation. (*People* v. *Stevenson,* 281 Ill. 17; *City of Beardstown* v. *City of Virginia,* 76 id. 34.) The object of a statute should be borne in mind, and language which is susceptible of more than one construction should receive that construction which will effect its purpose rather than defeat it. (*People* v. *Hinrichsen,* 161 Ill. 223; *People* v. *Price,* 257 id. 587.) If the words "may continue in session until the verdict is rendered and judgment entered, notwithstanding * * * the time occupied by such trial and the conclusion thereof may extend into and overlap a succeeding term or terms of the court," be given their plain, literal and ordinary meaning, they authorize the court to proceed with the trial of a criminal case at a term succeeding that at which it was begun, without an order or other affirmative action for that purpose. If the General Assembly had intended that such an order should be made it would have inserted in the act of March 21, 1913, a provision to that effect. Neither expressly nor by implication does the act require such an order, and the jurisdiction of the circuit court of

326–11

Will county was not lost or terminated because of the absence of an order continuing the cause from the initial or September term to the succeeding or November term.

*Second*—Plaintiffs in error assert that the evidence concerning the capture of Roa, Rizo, Stalesky and Torrez in LaSalle county following their escape from the penitentiary did not tend to prove the crime charged in the indictment, and that this evidence was highly prejudicial and should have been excluded. When a crime is committed as the result of a conspiracy some latitude is permitted in the proof to show the relations of the parties and the object and purpose of the conspiracy. (*People* v. *Billburg*, 314 Ill. 182.) The evidence to which objection was made shed little, if any, light upon the charge of murder or upon the conspiracy to escape from the penitentiary, in the consummation of which the murder was committed. When, however, the requests by Roa, Rizo and Torrez for interviews with the deputy warden; the simultaneous requests for the presence of Duschswski and Shader at the laundry and Stalesky's part in making those requests; the meeting of the six plaintiffs in error in front of the solitary building prior to their entering it; their concerted action in beating and stabbing the deputy warden to death and placing him in Odom's room and locking the door to that room; the standing guard at the vestibule doors so that no person could leave the building; the placing of all the men in the building, both keeper and convicts, in the solitary cells; the escape of plaintiffs in error from the penitentiary with a keeper in their custody, and other undisputed facts, are considered, the guilt of plaintiffs in error is so clearly established that the admission of the evidence, even if erroneous, relating to the capture of Roa, Rizo, Stalesky and Torrez could not have been prejudicial to them.

*Third*—While plaintiff in error Duschswski was on the witness stand relating his experiences after his escape from the penitentiary, and how he slept in a barn on a certain

day and traveled at night and to avoid arrest hid in a straw stack, one of the jurors, Healy H. Alexander, interrupted him by asking, "Where are you now?

Duschswski: "I am in the court house now.

Alexander: "This jury was specifically examined and instructed that these men were not to be convicted for getting out of the penitentiary. Now, I don't know where this gentleman is, but he must be somewhere near down in South America.

The court: "Well, this man is on trial here, Mr. Alexander, and I have not thought fit to interrupt his story.

Duschswski: "Well, then, if he wants me to tell all the way through I can tell all the way through.

The court: "Where did you go from there?"

Duschswski then told how he traveled from place to place and was finally captured. It is apparent that the juror thought that this portion of Duschswski's testimony was irrelevant to the issue to be determined. Nothing in the juror's inquiry or statement, so far as the transcript of the record shows, disclosed a fixed opinion on his part concerning the guilt or innocence of plaintiffs in error. The juror's tone of voice and manner of expression could not be preserved for review, but the same contention was urged on the motion for a new trial and the court found that there was nothing in the juror's conduct or manner which indicated that he was prejudiced against the plaintiffs in error. Hence it does not appear that what the juror said or did denied plaintiffs in error a fair and impartial trial.

*Fourth*—In the argument to the jury the assistant State's attorney said: "The only defendants to take the stand, and I am not commenting on those that did not, because the jury has no right to infer—" At this point an objection was interposed and sustained, and the court said: "Counsel will not refer to those that did not take the stand." Later, the State's attorney in his closing argument said: "And, gentlemen, you know that there is only

one punishment, and that is the punishment of death, that can be justified in this case under all of the evidence. The defendants do not deny their guilt and only ask punishment—" An objection was made to this remark and sustained. No other portion of the arguments made in behalf of the prosecution or defense has been preserved in the transcript of the record. The connection in which the State's attorney and his assistant made these remarks does not, for that reason, appear. Counsel for the prosecution are not permitted to make any reference to or comment upon the failure of a defendant in a criminal case to testify. (Crim. Code, div. 13, sec. 6.) The State's attorney and his assistant should not have made the remarks to which plaintiffs in error objected. Neither of these remarks, however, constituted a material factor in the trial and conviction of plaintiffs in error. The court instructed the jury that the neglect or failure of a person charged with crime to testify should not create any presumption against him. Under the evidence the jury could not reasonably have found any other verdict than one of guilty. The remarks of counsel for the prosecution, while objectionable, did not, in the state of the record, affect the jury's verdict and will not justify a reversal of the judgments. *People* v. *Young,* 316 Ill. 508.

*Fifth*—Plaintiffs in error complain that the court erred in giving the jury, at the request of the prosecution, the following instruction:

"The court instructs the jury that the law presumes a person to intend the reasonable and natural consequences of any act intentionally done."

No other instruction is shown by the abstract, although it appears from the transcript of the record that the court gave the jury 128 instructions. In order to determine whether an instruction is erroneous it must be considered in connection with all the other instructions given in the case. There may be an error in one or more of the instruc-

tions, yet if it can be seen, when all the instructions are considered in a series, that no injury has resulted to the party complaining, the error will be regarded as harmless. While an instruction which mis-states the law cannot be cured by another which correctly states the law on the same subject, an instruction which is merely incomplete can be supplemented by other instructions. Hence error cannot be predicated upon the giving, refusal or modification of instructions unless all of them are set forth in the abstract. (*People* v. *Heywood,* 321 Ill. 380; *People* v. *Goodman,* 283 id. 414; *People* v. *Weil,* 243 id. 208; *Reavely* v. *Harris,* 239 id. 526; *Thompson* v. *People,* 192 id. 79.) In this case, however, we have turned to the record and examined the instructions, and upon consideration of all the given instructions as a series we are convinced that the jury was properly instructed upon the law and that plaintiffs in error have no cause for complaint in that respect.

*Sixth*—The contention that there was no evidence of any intention on the part of plaintiffs in error to use force or violence from which death would ensue is without merit. Duschswski struck deputy warden Klein on the head three times with an iron bar, causing as many skull fractures. Roa stabbed him in the heart and Stalesky in the groin, and he suffered other wounds. The evidence clearly shows that all the plaintiffs in error were armed and acted in concert. Any one of four or five of these wounds, Dr. Fletcher testified, would have caused death, and his testimony was not contradicted. It would be difficult to conceive a more deliberate and atrocious murder.

*Seventh*—The final contention that the evidence was circumstantial and failed to exclude the hypothesis that the crime was committed by some person other than one of plaintiffs in error is likewise untenable. The testimony of the witnesses is direct, positive and uncontradicted that plaintiffs in error committed the crime. The verdicts of the jury were amply sustained by the evidence.

The judgments of the circuit court of Will county are affirmed. The clerk of this court is directed to enter an order fixing the period between sunrise and sunset on the 15th day of July, 1927, as the time when the original sentences of death entered in the circuit court of Will county shall be executed. A certified copy of that order will be furnished by the clerk to the sheriff of Will county.

*Judgments affirmed.*