(No. 19350.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CYRUS H. DRURY, Plaintiff in Error.

*Opinion filed June 19, 1929—Rehearing denied October 2, 1929.*

540

C. D. FITHIAN, O. B. DOBBINS, JOHN R. POGUE, and W. THOMAS COLEMAN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT F. COTTON, State's Attorney, and S. S. DUHAMEL, (LOTT R. HERRICK, of counsel,) for the People.

Mr. COMMISSIONER PARTLOW reported this opinion:

At the October term, 1926, of the circuit court of Douglas county, Cyrus H. Drury and Harry L. Crawford were indicted for a conspiracy. Drury was granted a separate trial. He was found guilty, sentenced to the penitentiary until discharged by law, fined $2000, and ordered to stand committed to the penitentiary until the fine and costs were paid. The judgment was affirmed by the Appellate Court for the Third District, and the case is before this court for further review.

It is insisted that the evidence fails to support the verdict. The indictment consisted of thirty counts, all of which were quashed or *nollied* except the first five. The first count charged that Crawford and Drury on March 1, 1926, did unlawfully, fraudulently, maliciously, wickedly and feloniously combine, conspire, confederate and agree together, and with divers other persons whose names were to the grand jurors unknown, with the fraudulent and malicious intent to wrongfully, wickedly and unlawfully obtain from the Hindsboro State Bank, a corporation, a large amount of money, property and credit of the value of $36,000, by means and use of the confidence game. The other four counts are substantially the same as the first, except that the second charged a conspiracy to obtain money by the confidence game, the third charged a conspiracy to obtain a large amount of property by the confidence game, the fourth charged a conspiracy to obtain credit to the extent of $36,000 by the confidence game, and the fifth charged a conspiracy to obtain funds, money and property by false pretenses.

Hindsboro is a village in Douglas county having a population of about 400 people. John Crawford and his sons, Harry and Elmer, were engaged in the grain and lumber business in Hindsboro under the name of John Crawford & Sons. Elmer Crawford was in active charge of this busi-

ness. The Hindsboro State Bank was organized in 1916 with a capital stock of $30,000. Harry Crawford owned fifty-eight shares, his father owned fifty-one shares and his brother fifty shares. Harry Crawford was the cashier and had been since the organization, his father was president and his brother was vice-president. The Arizona Power and Water Company was attempting to sell a $1,000,000 issue of its bonds. J. Everett Davis, a cousin of Crawford, was president of the First State Bank of Pesotum, Illinois, and was also the secretary and treasurer of the Arizona Power and Water Company, of which J. W. Tiscornia was the president. Drury resided at Clifton, Arizona. He was selling these bonds of the Arizona Power and Water Company and was associated with A. B. Graham. Corrigan & Co., a corporation of Grand Rapids, Michigan, dealt in stocks and bonds, and it was interested in the sale of this bond issue. Phil Corrigan was the president of this corporation and was active in dealing with the parties involved in this case.

Drury did not testify but Harry Crawford was one of his witnesses. Crawford testified that he first met Drury in 1919 or 1920 and that he only met him a few times after that date until May, 1924. On May 19, 1924, Drury, through Crawford, secured a loan from the Hindsboro State Bank for $1400 without giving any security. This money was deposited in the bank. On the same day a check for $800 was drawn by Drury. Within ten days the whole amount had been checked out, and by June 3, 1924, Drury had an overdraft of $500. There were no other transactions until September 26, 1924, when two checks of Corrigan & Co. to Drury for $2487.50 and $2578 came into the bank for deposit. About the same date two checks for $5065.50 were drawn by Drury against the bank. Crawford gave Drury credit for the two Corrigan checks and cashed the two checks drawn by Drury. These two Corrigan checks were paid by the Grand Rapids Savings Bank,

upon which they were drawn. The evidence shows that when the first two Drury checks were received A. B. Graham brought the checks to the bank and told Crawford that Drury had requested him to bring in the checks and that they were not to be cashed until Crawford received other checks for like amounts. Between September 24, 1924, and October 1, 1924, Drury deposited with the bank six other checks of Corrigan & Co. payable to Drury, in the amount of $2565.50, $2500, $2600, $2600, $5000 and $2500, making a total of $17,765.50 for the last six checks and a total of $22,831 for the eight checks. During the same period Drury drew four other checks payable to Corrigan & Co. and two payable to the Hudsonville State Bank for the same amounts as the last six checks as above stated. All of the checks drawn by Drury were honored by the bank, and the checks of Corrigan payable to Drury were deposited to his credit. On the last six checks issued by Corrigan & Co. payment was stopped by Corrigan & Co. and they were later protested. These six dishonored checks were charged against Drury's account, making an overdraft of $17,765.50. Crawford testified that before he honored these Corrigan checks he made inquiry of Graham, Davis and others as to the financial standing of Corrigan & Co. and found that it was rated as financially good. It is admitted, however, that it went into bankruptcy shortly after these checks were protested.

There is evidence tending to show that while these checks were being deposited, between September 27, 1924, and October 31, 1924, Drury, while in the office of Corrigan & Co., received from it at different times various sums amounting to $2350. With the exception of two instances when checks were delivered to Drury these amounts were paid by Corrigan & Co. to Drury in cash. On September 27, 1924, Corrigan & Co. drew a check payable to Arthur F. Rensland for $700. Rensland was an office boy employed by Corrigan. He was directed by Corrigan to

take the check to the bank, draw the cash and return with it to the office. This was done and Corrigan gave the money to Drury. This procedure was repeated on September 30 for $100, on October 2 for $400, on October 13 for $50, on October 16 for $100, on October 18 for $600 and on October 29 for $150. The check of October 18 was payable to Williams, another employee in the office. On October 31 two checks, each for $125, were drawn, payable to Drury and bore his indorsement. All of these checks were introduced in evidence and show that at the time the six original Corrigan & Co. checks were protested and payment stopped Corrigan & Co. had funds on deposit in the Grand Rapids Savings Bank. Drury offered to prove by Irwin H. Leiphart that these various amounts were paid to Drury for the purpose of paying fees of attorneys and engineers employed by the Arizona Power and Water Company, but the court sustained an objection to this proof.

After these transactions the record contains considerable evidence as to meetings, telephone calls and correspondence between Drury, Crawford and Corrigan with reference to these protested checks. Crawford testified that about October 6, 1924, he met Corrigan at Terre Haute, Indiana, with reference to the protested checks; that Corrigan called his office by telephone and ordered a check for $5000 sent to Crawford, but the check never arrived; that Corrigan called Davis and told him to send a check for $5000 to Crawford and the check arrived the next day, and that Corrigan gave Crawford certain notes and stock to hold for a few days until the protested checks could be settled. On October 22, 1924, the Auditor of Public Accounts wrote a letter to Crawford in which he stated that there seemed to be some uneasiness in the community relative to the operations of certain parties interested in the Arizona Power and Water Company, and Crawford was asked to inform the department whether or not Drury or his company, or anyone connected with it in any official capacity, was in-

debted, directly or indirectly, to the bank. Crawford testified that after receiving this letter from the Auditor he had no communication with Drury before his answer to the letter was sent. However, there is in the record a letter dated October 25, 1924, from Crawford to Drury, as follows: "I received a letter from the State Auditor last evening asking if C. H. Drury, or anyone connected with the Arizona Power and Water Company, was in any way indebted to this bank. This letter must be answered at once, yet I cannot inform them that these people owe me over $12,765 and you $1900. This is far above our loan limit, * * * and I cannot hold this letter longer than Monday or Tuesday to make reply. It should go out from here Monday evening. They [meaning the Continental and Commercial Bank of Chicago, the correspondent of the Hindsboro State Bank at that time,] are off this Grand Rapids affair and don't mince words telling me so. You know their cashier called on me Wednesday of this week. They have a good line on this deal. The cashier of the Grand Rapids Trust and Savings Bank was in to see the Continental and Commercial Bank a few days ago, and from him, I judge, they gleaned a good lot of information. Of course, not knowing any of the details of your project, they look upon it with a critical eye, and cannot understand how we, a small country bank in Illinois, could get mixed with this affair in Grand Rapids. * * * This has placed me in so bad that it is going to be necessary for me to get on the outside to raise some money to take care of things here, so that just as soon as you get things squared away so that this stock can be used for collateral I want you to let me know, for I must get busy."

On October 29, 1924, Crawford wrote to the Auditor of Public Accounts as follows: "Regarding the Arizona Power and Water Company and Cyrus H. Drury, neither of these are indebted to this bank at this time. We have carried an account with Drury for the past two years and a

short time ago he mailed us some checks for deposit by Corrigan & Co. These checks went to protest. This matter hung fire for several days on account of Mr. Drury being in Arizona. During the past few days this matter has been entirely cleaned up, all the checks taken care of, and neither Mr. Drury nor his company are directly or indirectly indebted to this bank." The evidence shows that later in 1924 the Auditor wrote to certain directors of the bank calling their attention to these transactions. Some of the directors talked to Crawford and he assured them that the matter was all settled. The books of the bank show that on October 14, 1924, Drury drew a check for $4500, which was paid by the bank. This check was missing from the files, and the book-keeping entry is shown under the heading of checks in detail. The charge of $4500 was in the handwriting of Crawford.

On December 26, 1924, a contract was entered into between the bank, Drury and Charles B. Winslow, of St. Joseph, Michigan. This contract recited that the bank was the holder of the protested checks of Corrigan & Co. for $17,765.50, with a credit of $5000 thereon; that the bank held as collateral therefor a $2500 note of Corrigan payable to Drury, 500 shares of stock of the Federal Warehouse Company issued to Corrigan, a note of $6000 signed by Corrigan payable to the bank, and two notes of J. W. Tiscornia for $3000 each. It was agreed that Winslow should purchase from the bank its claim against Corrigan for $11,000, to be paid $5000 in cash, a sixty-day note of Tiscornia for $3000, and a ninety-day note of Tiscornia for $3000, payable to Drury; that in assigning its claim to Winslow the Hindsboro State Bank reserved all its rights and claims against Drury on his indorsement of the checks in question and all rights with respect to the balance of the claim not covered by the cash payment of $5000. The bank acknowledged the receipt from Winslow of $5000 in cash and the two notes of Tiscornia for $3000 each, payable to

Drury. The bank delivered to Winslow the Corrigan protested checks and the notes and stock held as collateral therefor. Drury agreed that he was the indorser of the checks mentioned in the agreement. He consented to the terms of the contract. He acknowledged the receipt of the two notes of Tiscornia for $3000 each, and that these notes, although payable to him, were in fact the property of the Hindsboro State Bank; that he was indebted to that bank for the balance of its claim in the sum of $1935.43, and he agreed to settle and adjust his obligation accordingly. This $5000 in cash, less $500 attorney's fee, was credited to Drury's account. None of these notes were ever paid.

Crawford testified that Drury never turned over to the bank the Tiscornia notes described in the contract of December 26, 1924, because Crawford refused to receive them; that he (Crawford) never had any relations of any kind with Drury for the bank other than that of banker and customer. But on December 29, 1924, Crawford wrote Drury a letter in which he said that he hoped Drury would succeed in getting these notes discounted and send the proceeds to Crawford. On November 3, 1925, Crawford wrote Drury a letter in which he said: "You remember I at first held Tiscornia's notes for half the amount, this half turned back to you in making the final settlement with Corrigan, but I feel that Tiscornia is morally obligated in this case to lend some assistance." On December 31, 1924, Crawford wrote Drury as follows: "I am anxiously awaiting the day when these things all get cleared away and I can take a more active part with you in your project, for I assure you I am deeply interested in the proposition and would like to be one to help put it through."

On March 9, 1925, the balance of Drury's account was $10,176.36, and he gave his three notes to the bank, two for $4000 each and one for $2176.36, and his ledger account was closed. These notes were carried by the bank

as a part of its assets. The two $4000 notes were never paid. Crawford testified that the $2176.36 note was paid in cash, but the books show no such payment.

Crawford testified that between February 14, 1926, and March 23, 1926, he received on Drury's account $7150 from Drury, Bruce Hanley, E. C. Crawford and Bob Lyons, which sum was paid in various amounts under different dates. He testified that when he received these various payments, instead of crediting them to the account of Drury he credited them either to his own personal account or to the account of John Crawford & Sons. The bank records show no deposit of any such amounts at or near the dates mentioned or any amounts approximately the same, and it is very questionable whether these sums were received by Crawford, because of the fact that during this time Drury was drawing checks on the bank, and he drew out of the bank, with Crawford's aid, $5223.39. This evidence with reference to these alleged credits of $7150 due Drury is not in harmony with the telegrams of Drury to Crawford dated February 20, 1926, in which Drury stated that by taking advantage of checking in a small way he was enabled to crowd business and would cover everything possible by February 26. Nor is it in harmony with Drury's telegram of March 8, 1926, being the day the $10,000 check was protested, in which telegram Drury told Crawford that he firmly believed he could have all of $20,000 in his hands by Saturday night; that he was rushing everything and would stand behind Crawford as solidly as Crawford had stood behind him, and "we are assured of success now."

In the latter part of 1925 and the first part of 1926 John Crawford & Sons became deeply involved and the bank itself was hard pressed. It then held two notes of Drury for $4000 each. Harry Crawford and John Crawford & Sons were heavily overdrawn in the bank. Between February 15, 1926, and March 22, 1926, Drury, who then lived in Kansas City, drew twenty-four checks on the Hindsboro

State Bank, amounting to $5223.39, which were cashed in Kansas City and later by the Hindsboro State Bank. Each of these checks was originally signed by Drury, but in each instance when Crawford received the checks he erased Drury's name and signed his own name to the checks, and they were all paid through Crawford's personal account, which was largely overdrawn. Crawford testified that he never told Drury of this change. Drury knew when he signed these checks that he had no money in the bank to his credit, that he had no checking account with the bank and that he was indebted to the bank in a large sum. The last three checks, amounting to $608.64, were paid April 5, 1926, the day before the receiver took possession of the bank.

On February 27, 1926, Drury drew three checks on the Valley Bank of Clifton, Arizona, payable to Crawford, for $10,000, $2000 and $750, respectively. Crawford credited the account of John Crawford & Sons with the first two checks and his own personal account with the last one. On March 4, 1926, Drury drew two other checks on the same Valley Bank, payable to Crawford, one for $1000 and the other for $500, both of which Crawford deposited to his own account in the Hindsboro State Bank. All of these checks were protested for non-payment and returned stamped "no funds." They were never paid and all of them were used by Crawford to give false credit to the account of John Crawford & Sons and his own account. Without the credit of these checks both accounts would have been overdrawn in large amounts. It is the contention of the People that the giving of these five checks was pursuant to a plan of Drury and Crawford made at the bank on February 27, 1926, when the three checks for $12,750 were drawn. On this date Drury was supposed to be living at the Hotel Muehlbach, in Kansas City. Crawford testified that he did not see Drury in Tolono, Illinois, on that date or see him on that date at any other place. A telegram dated February 27, 1926, was introduced from Crawford

to Drury, as follows: "Do you want me to meet you To-lono Saturday?" A reply from Kansas City on the same date, signed by Drury, read: "Yes, meet me in Tolono in morning. Will be at hotel." Two clerks in the Hindsboro State Bank testified that Crawford and Drury were in a conference in the bank for about an hour on that date. Drury contends that all five of these checks were executed in Kansas City on February 14, 1926, and were post-dated, and they were not to be used until funds had been deposited in Arizona to meet them. In support of this contention Crawford testified that on February 14, 1926, he and Bruce Hanley met Drury at the hotel in Kansas City; that Drury said he had some money due him and he would make Crawford a loan of $15,000 just as soon as he got his money; that it was agreed that Drury would draw five checks for $14,250 and post-date three of them on February 27 and two on March 4; that Crawford was not to use the checks until he received word from Drury that the money was in the bank to pay them. Crawford testified that he took these checks home with him; that he put them through the bank before he received word from Drury to do so, and that was the reason the checks were returned protested. The testimony of Crawford as to the date of this meeting, February 14, is not in keeping with the telegram from Drury to Crawford dated February 15, 1926, reading: "Arrive Tolono Tuesday morning. Will be at Jacques Hotel till you come. Notes going good."

The witnesses who testified for Drury were Harry and Elmer Crawford, A. L. Galbraith, A. B. Graham, H. B. Hanley and I. H. Liephart. The last three were associated with Drury in various enterprises, including the Arizona Power and Water Company. J. Everett Davis was the secretary and treasurer of the Arizona Power and Water Company. He is a cousin of Crawford. He told Crawford that Corrigan & Co. had a high financial rating, but it went into voluntary bankruptcy before these transactions were

closed. Davis promised Crawford that when the Arizona Power and Water Company was financed Davis would deposit $50,000 of its funds in the Hindsboro State Bank. Drury promised Crawford that he would secure for him a position with the United States Copper Mining Company at a salary of $10,000 per year.

The indictment did not charge a confidence game, neither did it charge that funds, money and property were obtained by false pretenses. The first four counts charged a conspiracy to obtain property by means of the confidence game, and the fifth charged a conspiracy to obtain funds, money and property by false pretenses. Each count charged that Drury and Crawford conspired together and with persons to the grand jury unknown. The essence of a conspiracy is not the accomplishment of the unlawful object, but it is the unlawful combination or agreement to accomplish the criminal or unlawful purpose. The conspiracy is complete when the unlawful combination or agreement is made, regardless of any subsequent interruption of the efforts to carry out the object of the conspiracy. (*People* v. *Lloyd,* 304 Ill. 23.) It is not necessary to prove any overt act towards the accomplishment of the unlawful purpose, (*People* v. *Glassberg,* 326 Ill. 379; *People* v. *Robertson,* 284 id. 620;) nor is it necessary to prove that the conspirators agreed, in terms, to pursue the common design. The conspiracy may be proved by direct evidence or by the conduct of the parties, by statements, documents, facts and circumstances which disclose a common design on the part of the accused persons to act together in pursuance of a common criminal purpose. (*People* v. *Nusbaum,* 326 Ill. 518.) Any false representation of an existing fact or condition by which a party obtains the property of another is a false pretense under a statute making it a crime to obtain property by false pretenses. (*People* v. *Peers,* 307 Ill. 539; *Jackson* v. *People,* 126 id. 139.) In *Cooke* v. *People,* 231 Ill. 9, money was obtained from the

public treasury by false pay-rolls made by the clerk of the circuit court of Cook county and the conviction of the defendants was sustained. In *People* v. *Smith,* 239 Ill. 91, the defendants organized a bank without having the capital stock fully paid; they obtained a charter by deception; they elected themselves as officers and directors; they made and published false statements that the bank was solvent and that it had a large capital fully paid and large assets and surplus; they obtained the money of stockholders, depositors, creditors and customers of the bank; and it was held that they were guilty of a conspiracy to obtain goods and money by false pretenses. It is the means by which the property is obtained that distinguishes an offense under the confidence statute from the offense under the false pretense statute, and not the character of the title or the benefit that is obtained by the swindlers. (*People* v. *Miller,* 278 Ill. 490.) If the transaction is, in fact, a swindling operation, it is immaterial that the form assumed is that of a lawful business transaction. (*People* v. *Kratz,* 311 Ill. 118.) Every overt act is a renewal of the conspiracy, and the offense is continuous so long as overt acts in furtherance of its purpose are committed. The conspiracy is renewed as to all conspirators by each and every overt act. (*People* v. *Blumenberg,* 271 Ill. 180.) Where the conspiracy is established by the evidence it is proper to prove against any and all of the conspirators the relations of the parties, the object and purpose of the conspiracy, and the acts and declarations of any one and all in furtherance of the common design, including plans disclosed by conversations of the conspirators. (*People* v. *Looney,* 324 Ill. 375; *People* v. *Bundy,* 295 id. 322; *People* v. *Hedge,* 284 id. 513.) Everything said and done by any conspirator in the execution of the conspiracy binds each and all of the conspirators and is admissible in evidence against them. The Statute of Limitations begins to run from the date of the commission of the last overt act in furtherance of the com-

mon design. *People* v. *Walsh,* 322 Ill. 195; *Ochs* v. *People,* 124 id. 399.

Drury insists that the money of the bank was in the custody and control of Crawford as cashier, and that he could not be guilty of a conspiracy to obtain money from his own custody by means of the confidence game because he was the one whose confidence had to be obtained and betrayed. If this contention be conceded and it be held that Drury was not guilty under the first four counts of the indictment, this would not work a reversal of the judgment provided the evidence proves, beyond a reasonable doubt, that he was guilty of a conspiracy to obtain funds, money and property of the bank by false pretenses, as charged in the fifth count. The purpose and intention of the parties must be determined from the undisputed documents as well as the oral evidence. Crawford testified that he had no relations with Drury other than those of banker and customer. He attempted to explain all of these transactions as legitimate business dealings. His testimony, however, is so contradictory of the admitted facts that such a contention cannot be sustained. He testified that when Drury first came to the bank he was practically a stranger, and yet Crawford loaned him $1400 without security and without any apparent investigation as to his financial standing. Shortly afterwards he honored Drury's checks in an overdraft of $500. It is difficult to believe that there was no common understanding or design between them at the time these transactions took place. Four months later Crawford, upon a telegram from Drury and upon a representation by Graham, accepted $5065.50 in checks from a corporation with which he had no prior business dealings and honored checks of Drury corresponding in amounts. A few days later he honored other checks, making a total of $22,831 paid out without any security whatever. The checks of Corrigan and Drury were for the same total amounts and the individual checks were for corresponding

amounts. By this transaction the bank lost $8000 which was never re-paid. Shortly after these transactions Crawford received a warning from the Auditor with reference to these parties. In response to this warning he made false statements as to what had been done. If Crawford is to be believed, Drury later deposited $7150. At that time Drury owed the bank over $8000. Crawford did not credit these deposits, if they were made, upon the notes which Drury owed the bank, but he permitted Drury to check out $5223.39 of this amount. In so doing he scratched out the name of Drury as signed to the checks and signed his own name and charged the checks to his own account or to the account of his father. These dealings were one continuous transaction and cannot be divided into separate transactions, as contended by Drury. The Statute of Limitations did not begin to run until the date of the last transaction, which was within eighteen months of the indictment, therefore the offense was not barred by the Statute of Limitations. We think the evidence shows, beyond a reasonable doubt, that Crawford and Drury from the first had a common understanding with reference to these transactions; that it was the purpose and intent of Drury to obtain the funds of the bank by false pretenses; that he could not have succeeded in his attempt without the active aid, consent and co-operation of Crawford; that the money and property of the bank were obtained by "kiting checks," by stopping payment on checks after they were issued, by issuing worthless checks without money to pay them, by Drury drawing checks on the bank after his account was closed and while he had no checking account, with which checks were paid, by making false statements, by making false entries in the books of the bank, by giving false credits, by changing and altering checks, and by a general plan of fraud which wrecked the bank and justified the jury in finding Drury guilty of a conspiracy to obtain

the property of the bank by false pretenses, as charged in the indictment.

It is insisted that the court improperly admitted in evidence the books of account kept by Crawford, the letters of the Auditor to officers and directors of the bank, and the checks of Corrigan & Co., amounting to $2350, payable to its office employees, the proceeds of which were alleged to have been paid to Drury. In the rulings of the court on the admission and exclusion of evidence in conspiracy cases considerable discretion is left to the trial court. (*People* v. *Shader,* 326 Ill. 145; *People* v. *Nall,* 242 id. 284.) In this case the conspiracy charged was established by the evidence, therefore evidence as to the acts and conversations of the individual members of the conspiracy were admissible against the other members. The method by which the transaction was handled in the bank was admissible. The letters of the Auditor to Crawford were called to the attention of Drury before the letters were answered. At the time the checks of Corrigan & Co. were issued the evidence shows that Drury was in the office of Corrigan & Co., and the proceeds of the checks, or at least a part of them, were delivered to Drury. There was no error in the admission of any of this evidence.

It is urged that it was error to refuse to allow Leiphart to testify that Drury individually did not receive $700, the proceeds of a check of Corrigan & Co. to its office employee, but that he paid out this money to an attorney and engineer for services rendered and expenses incurred. The witness was permitted to testify as to his relations with the Arizona Power and Water Company and its attorney and engineer. He was then asked to relate a conversation with Corrigan with reference to the payment of this $700 as expenses which had been incurred by the corporation. An objection to this conversation was sustained. Counsel then made a long offer as to what he expected to prove. The offer was not limited to the question to which the ob-

jection was sustained. In fact, it made little reference to any conversation between the witness and Corrigan, but the statement went into detail as to the arrangements made to pay the expenses and fees of the attorney and engineer. If the witness had any personal knowledge as to the facts sought to be proved such evidence was competent. He was not asked, however, as to such personal knowledge, but the question was directed to a conversation which he had with Corrigan out of the presence of the defendant and out of the presence of all other parties interested in the case. The offer did not show that the witness had personal knowledge of the facts about which the offer was made and for that reason was properly excluded. Even if the evidence was improperly excluded the ruling did not constitute reversible error.

Upon the cross-examination of Crawford it appeared that the People had certain letters and telegrams from Crawford to Drury. The defendant moved that they be suppressed, that they be returned to him, and that he be permitted to show that they had been taken from his custody by an illegal search and seizure, in violation of his constitutional rights. At the time the letters were secured Drury was in jail. His trunk in which he kept the letters was held in a storage room in his hotel in Kansas City pursuant to an inn-keeper's lien for the non-payment of his hotel bill. A search warrant was issued by a court in Kansas City, the trunk was opened by a deputy sheriff, the letters and telegrams were taken therefrom and were delivered to the State's attorney of Douglas county. Counsel for Drury claimed that they did not know that these letters and telegrams were in the possession of the State's attorney until they were offered in evidence, and they had no opportunity before the trial to make a motion to suppress them. The court heard some evidence upon the motion, then struck out all of the evidence offered and admitted the letters in evidence, and this ruling is assigned as error.

The general rule is, that where it is claimed that evidence against one accused of crime has been obtained by means of unlawful search and seizure, the court will not stop in the midst of the trial and hear evidence in order to determine whether the manner of securing the evidence was legal or not but such question must be raised before the trial. (*People* v. *Winn,* 324 Ill. 428; *City of Kewanee* v. *Puskar,* 308 id. 167; *People* v. *Brocamp,* 307 id. 448; *Gindrat* v. *People,* 138 id. 103.) These letters and telegrams were procured through some process under the laws of Missouri. There was nothing before the trial court to show that this proceeding was illegal except the bare claim of counsel that it was in violation of the constitutional rights of the defendant. The letters and telegrams bore on the acts and conversations of the conspirators, and even if the letters were improperly admitted, it is conceded by counsel for Drury that their admission did no harm. In their brief they say: "We submit that, reading all of the letters through, instead of proving anything against the defendant they corroborate the defendant in every way, and showed that the real crook in the case was Corrigan & Co., as well as their bank in Grand Rapids, Michigan, which permitted them to stop payment on their $17,776.36 of checks, and, instead of showing conspiracy and confederation between Crawford and Drury, disclosed exactly the contrary." If this statement is true no injury was caused even if the evidence was improperly admitted.

Nineteen instructions were given on behalf of the People. Thirty-eight were offered on behalf of the defendant, twenty-nine of which were given. Error is assigned on eleven of the nineteen given on behalf of the People. A few of these instructions have been criticised by this court, but even the ones criticised have not been held to constitute reversible error. When all of the instructions are considered as a series they fully and fairly inform the jury as

to the law applicable to the facts, and the defendant was not injured by any instruction given.

Complaint is made of several instances in which it is claimed that improper argument was made to the jury. The most of the arguments on both sides appears in the abstract. We have examined the arguments on both sides and find no place where we think the argument was not justified under the law and the evidence.

Most of the evidence is not in conflict and it establishes the guilt of the defendant beyond a reasonable doubt.

The statute (Smith's Stat. 1929, p. 1081,) provides, in part, that "no person shall by any court be committed to the penitentiary, reformatory or other State institution for the recovery of a fine or costs." The judgment is modified by striking out that portion directing that the plaintiff in error be confined in the penitentiary until the fine and costs are paid, and as so modified the judgment is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*