People of the State of Illinois, Defendant in Error, v. Charles A. Braun et al., Plaintiffs in Error.

Gen. No. 40,722.

Heard in the first division of this court for the first district at the June term, 1939. ▮▮▮▮ Opinion filed January 22, 1940.

CHARLES A. BELLOWS, of Chicago, for plaintiffs in error; J. W. BELLOWS, of Chicago, of counsel.

THOMAS J. COURTNEY, State's Attorney, for defendant in error; EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, BLAIR L. VARNES, RICHARD B. AUSTIN and ALEXANDER J. NAPOLI, Assistant State's Attorneys, of counsel.

MR. JUSTICE MCSURELY delivered the opinion of the court.

Defendants are officials of the village of Dixmoor, Illinois, a town near Chicago of 1,200 inhabitants lying on Western avenue, a highway much used by motorists; they were charged with conspiring unjustly and oppressively to extort money from motorists; they were tried by a jury and found guilty. Robert Greco, Charles Paduano and Tony Bater, police officers, were each sentenced to serve one year in the house of correction and to pay a fine of $500; Charles Braun, police magistrate of the village, and Charles Special, president, were each sentenced to one year in the house of correction and fined $2,000; they seek a reversal.

From 1936 to 1938, inclusive, the village found itself in the situation like that discussed by Mr. Chief Justice TAFT in *Tumey v. State of Ohio,* 273 U. S. 510, 71 L. Ed. 749, 47 Sup. Ct. 437, where the court considered the case of a magistrate whose only compensation was derived from defendants tried before him and found guilty. If a defendant was acquitted the magistrate received no compensation. This was condemned by the chief justice in a notable opinion.

In the instant case these defendants depended for compensation for their services upon the collection of fines imposed on motorists. President Special testified that the fines levied against motorists went into the road and bridge fund, from which they were transferred to the general fund from which salaries of the defendants were paid. On one occasion Mr. Special was requesting the village trustees to appoint Mr. Bater as a policeman; when he was asked how Bater

could be paid Mr. Special replied that his compensation would come "out of the highway."

On another occasion Mr. Special said that the police had to make at least 10 "pinches" a day in order to make their salaries,—"That was the way he had to make a living, they had to eat that way."

The situation, then, was that it was necessary, in order to receive their salaries, that defendants should carry on an intensive campaign against motorists under the guise of enforcing the traffic laws but for the real purpose of raising funds from which their salaries would be paid.

A conspiracy may be proved by evidence of the conduct of the parties and facts and circumstances disclosing a common illegal design. It was unnecessary to prove the defendants adopted in any formal way a resolution or statement of their purposes. *People v. Drury,* 335 Ill. 539, 551. There was in evidence a report from the books of the village showing the fines collected in the various months during the fiscal year just prior to the indictment of the defendants. They run from May, 1937, when the total fines for that month were $198. They increased during the summer months to something over $300 a month, but after police officer Bater assumed his duties the fines for November, 1937, jumped up to $989.50 and approximated this figure during the winter months of 1937 and 1938.

Moreover, soon after the increase in fines from motorists began, Special himself commenced to get substantial sums of money from the village. In December, 1937, he got $584.89, and the next month over $300. He testified that these sums were to repay him for moneys he had advanced for village expenses. The records of the village showing receipts were gotten together by magistrate Braun to bring them for inspection to the State's Attorney's office, but he testified that the night before he had planned to visit the

State's Attorney his court room where these records were kept was burglarized and the records stolen.

The main point presented in defense is that nearly all of the motorists who were arrested by officers and brought before magistrate Braun pleaded guilty to the offense charged against them, and defendants' counsel argues that this is proof that defendants could not be guilty of unjustly extorting money from the motorists. We hold this conclusion does not necessarily follow.

A typical case was that of Sidney E. Stern who testified that before entering Western avenue, knowing it was a State road, he looked to see if there was any traffic and there was none for at least three blocks and he turned into Western at about 3 miles an hour and was at once stopped by officer Bater and taken to the court room of defendant Braun; he was there told he was charged with going into an intersection of a State road without stopping; Stern denied that he was guilty, because he had used more than ordinary precaution before entering Western; Justice BRAUN told him the maximim fine for this offense was $200 and if he wished to have a trial he would have to put up a $200 cash or real estate bond; Stern indicated that he would be unable on a Saturday afternoon to get a real estate bond for this amount and inquired what alternative there was and was told by the justice, "You will have to go to jail"; Stern then pleaded guilty and was fined $5 with costs of $5 which he paid.

Dr. Zurndorfer was arrested charged with going 55 miles an hour; he testified that he was positive he was not going more than 35 miles an hour, the maximum speed limit on this highway in Dixmoor, and believing it was of no use to defend himself he pleaded guilty and was fined $5 and $5 for costs; there was no trial.

George Ewin was arrested charged with exceeding the speed limit of 35 miles an hour; he testified that he

was familiar with the speed of his car and he was certain he was not exceeding the maximum of 35 miles; he was told by Justice BRAUN that he might be fined up to $100 but under the circumstances he would be fined $5 with $5 as costs.

Dewey Miller was arrested and charged with crossing the tracks of the Grand Trunk railway while the red railroad stop signal was flashing; he testified that he stopped when he came to the tracks and saw a train standing still approximately four or five blocks away and there was no indication that the train would move for possibly an hour; he was told by Justice BRAUN that it was possible to fine him $200 for the offense and after much talk, "in order to make things easy for myself," he pleaded guilty and was fined $10.

Clifton Tatro was driving a truck for Armour & Co., delivering meat to a nearby sanitarium; he was traveling 15 miles an hour; he was arrested on the ground that he had no rear plates on his truck; he was then charged with failure to wear his chauffeur's badge on his cap; Tatro explained that he never wore his badge on his cap because he carried meat and his badge would get green; he presented his license and pictures but was not allowed to go until he paid Braun $15.

Silvester Pataczek worked for the Feldman Petroleum Company; he was driving a truck belonging to his employer and there was a dispute between him and officer Greco as to whether he made a dead stop at a highway; Pataczek was fined $10 but did not have the money; Feldman, the owner of the truck, was called by phone and told that he could not have the truck until the $10 was paid; he asked defendant Braun over the phone what the trouble was and was told that the driver of the truck was arrested "for not stopping at a sign." Feldman was admitted to practice law and asked magistrate Braun to set the case for hearing and was told by the latter that it was all over; that the driver had been fined $10; Feldman

argued that Braun had no right to keep the truck and was told by Braun that "we cannot release the truck." A brother of Feldman went out to Dixmoor to get the truck and was told he could not have it. There was considerable more argument over the matter and finally, under the advice of Feldman's brother, magistrate Braun was given $10 and the truck was released. It had been stopped at about 10 o'clock in the morning and was not released until after 3 o'clock in the afternoon.

Motorist Linquist was charged with exceeding the speed limit and was told definitely that "We have to set a fine for compensation to pay these officers." Linquist testified he was not exceeding the speed limit.

Defendants' testimony tended to contradict in some respects the version of plaintiff's witnesses as to the above incidents, but we see no sufficient reason to hold that the jurors, who saw and heard the witnesses, could not reasonably find with the plaintiff as to the facts.

It would unduly lengthen this opinion to note all of the instances of motorists who were arrested and brought before the magistrate where, instead of being tried, they were persuaded, for fear of the imposition of a large penalty, to enter a plea of guilty and pay the magistrate $5 or $10. The jury could reasonably believe such pleas were in fact not admissions of violation of traffic laws but were simply for the sake of avoiding the annoyance of a trial, with an intimation that the result would be the imposition of a severe penalty. The pleas of guilty by the motorists were simply purchases of peace from further annoyance and could well fit in with the conspiracy charged.

The jury could properly believe that there was a common agreement by the defendants to harass motorists and truck drivers, and by covert threats induce them to pay a small fine rather than have a trial where the merits could be examined.

There was also abundant evidence from which the jury could properly conclude that this campaign

against the motorists was not animated by the purpose of enforcing the traffic laws but, as admitted by statements of the principal defendants, for the purpose of securing compensation for themselves.

It is said the court admitted incompetent evidence. We do not find anything in this respect which would amount to reversible error.

It is said that the State's Attorney made improper remarks when at one time he said, "This conspiracy has been going on for 20 years." The court properly sustained an objection to this and instructed the jury to disregard it. There were frequent colloquys between respective counsel, witnesses and the court but nothing appears of decisive importance.

The court properly instructed the jury that a conspiracy was a combination of two or more persons by some concert of action to accomplish some criminal or unlawful purpose, or some purpose not in itself criminal or unlawful by criminal or unlawful means. This is a correct statement of the law, and in *People v. Cohn*, 358 Ill. 326, it is held that a guilty intention may be inferred when the means used are such as ordinarily would result in the commission of the forbidden act. Taking the instructions as a whole they correctly state the law.

Defendants argue that the indictment is fatally defective because they are charged with conspiring to extort money and to defraud. This is not open to the objection of duplicity. Defendants could properly be charged with conspiring to extort money *and* to defraud. It is well settled that in making the charge of conspiracy the means of carrying out the conspiracy need not be stated.

The People properly call attention to ch. 53, sec. 59, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 48.041], which provides that the fees for a police magistrate, where a defendant pleads guilty, should be $2 and no more. In many of the cases appearing in the record

defendant Braun charged $5 as costs, although the parties charged had pleaded guilty.

Defendants had a fair trial and from all the circumstances presented, the jury could reasonably find them guilty as charged.

The judgment is therefore affirmed.

*Affirmed.*

MATCHETT, P. J., and O'CONNOR, J., concur.